## WILLIAM J. HINTON V. THE STATE.

This court will not reverse a judgment, for the refusal of a new trial, on the
ground of the admission of improper testimony, if the appellant neither ob-
jected to its introduction, nor moved to exclude it during the trial; and where,
so far as the record shows, it might have been a proper response to some
question propounded by his counsel.

Sudden passion is a necessary element of the offence of manslaughter, under
our Code; it is not error to refuse a charge attempting to define the offence,
which omits this as one of its ingredients.

A reasonable belief, that another intends to inflict on the party some serious
bodily injury, and that he is in such a position, that he may carry his inten-
tion into effect, is not sufficient to excuse the killing of him upon that appre-
hension; such belief must be founded in part upon some other act of the
deceased, showing that he has a present intention to inflict the injury; and
even then, the means used to repel the assault, and prevent the impending
inquiry, must be only such as are necessary under the circumstances.

APPEAL from Falls. Tried below before the Hon. N. W.
Battle.

This was an indictment found on the fifth day of April, 1859,
charging William J. Hinton with the murder of Pleasant C.
Whittaker.

The facts proved upon the trial, showed that the defendant
and the deceased were brothers-in-law; and that the defendant
came to Whittaker's house, on the evening before the difficulty,
and staid all night. The deceased had previously been drink-
ing, and was very much debilitated, and as his wife testified,
"able to go about from room to room, and that was about all."
The wife of the deceased, and sister of the defendant, was con-
fined to her bed with sickness. When the defendant came, the
deceased sent off for whiskey, and they drank that evening, and
during the night.

Before daybreak, one Covington, who had been drinking with
them during the evening, came to the house again, and they
resumed their drinking, during which Covington and Hinton

quarrelled; Mrs. Whittaker being disturbed by the noise, requested Covington to leave; with which he complied; Hinton followed him into the cotton-field, and resumed the quarrel, having a pistol, which he presented at him; Covington expostulated with him, and pacified him; whereupon he urged Covington to return to the house, who replied that he did not wish to "make a fuss there, and disturb his sister;" Hinton, among other things in reply, said that if Whittaker fooled with him, he would blow his G—d d——d heart out; that Whittaker should not run over him, because he had a few negroes, and he (defendant,) did not have any.

Before this part of the transaction occurred, the defendant and the deceased came into Mrs. Whittaker's room, having three or four pistols in their hands, which they gave her, to be locked up. A short time afterwards, the defendant called for his pistol, saying that he would go home, and it was delivered to him. Covington and Hinton returned to the front gate in company. Mrs. Whittaker sent her little daughter to the gate, requesting the defendant not to come into the house, but to go home. He came into the house, and into her room, and cursed and swore very loudly; he demanded of her why she had sent him word to go home. She replied that she wanted no fuss, and desired him to go home. He refused to comply, unless she would "tell him what he had done."

When the defendant came into the room, the deceased followed him, and requested him to go home, and not to disturb his wife; that they had kept her awake all night, and "now go home." The deceased was crying during this conversation. He repeated, as many as three times, the expression, " all I ask of you, is to go home." The defendant started to leave the room. Covington testified, that when the deceased went into the room, he said, " Bill, go home;" and that the defendant swore he would not leave until he got ready; that his request being repeated two or three times, the deceased said, "look at the situation of your sister;" when the defendant said, "he did not care; that she was as near to him as to the deceased." Whittaker replied,

that "he need not think he could run over him in his own house; that he was as brave a man as he dare be."

Mrs. Whittaker stated, that when Hinton started to leave the room, the deceased drew his knife from his pocket, but she did not see him open it; and expressed a doubt as to his ability to open it, owing to his weakness; she thought, indeed, that he could not. She stated that he had no knife in his hand after he was shot; that it was in his pocket, having been taken out and handed to her, after the shooting.

Covington stated, that Whittaker came out of the room behind Hinton, with his hand on his shoulder or back, as if gently pushing him along; the defendant did not seem to resist, but walked along through the hall, to the front passage; that when they reached the front gallery, Hinton turned, pushed Whittaker back, fired, and ran; that the deceased had a knife in his hand, as he came out of the room; the knife, which was a common pocket-knife, was open or half open; he did not attempt to use it, and it was held in his right hand, as his arm hung down by his side.

The daughter of the deceased testified, that as the deceased went out of the room, with the defendant, she endeavored, by taking hold of her father's hand, to take the knife from him, which was in his hand, hanging down by his side, as he was walking along. Whilst the deceased was on the gallery, before he was shot, he requested the defendant to go home; to which he replied, with an oath, that he would not leave there until he got ready. The deceased replied, that he would compel him to go; he made no attempt to use his knife, nor used any threats; and was in the act of putting his knife in his pocket, at the time he was shot. The defendant was standing on the ground, and the deceased upon the gallery, when he fired.

The death of Whittaker, from the wound inflicted by the defendant, occurred on the 27th day of December, 1858, three days afterwards. The jury found the defendant guilty of murder in the first degree; and the judgment of the court was rendered in accordance with the verdict, sentencing him to death.

The defendant filed a motion for a new trial, on the grounds, 1st. That the verdict was contrary to the law and the evidence. 2d. That the court erred in refusing to give the second and third charges asked by the defendant's attorneys. 3d. The court erred in permitting the testimony of Mrs. Whittaker, of the declarations made by her husband, not made in view of death, to go to the jury, as evidence.

The statement of facts contained the evidence of Mrs. Whittaker, referred to in the last ground of the motion, to the effect stated in the opinion. No objection appeared to have been made to its introduction, nor was there any other reference to it than as already shown.

The motion was overruled, and the defendant appealed and assigned for error the grounds specified in the motion for a new trial.

*A. G. Perry*, for the appellant.

*Attorney-General*, for the appellee.

ROBERTS, J.—The appellant was convicted of murder in the first degree. Upon the cross-examination of Mrs. Whittaker, a witness for the State, she stated that her husband had previously told her, that Hinton would kill him some day. This evidence was not objected to at the time it was given, nor was any motion made during the trial, to exclude it from the consideration of the jury. It might have been, so far as the record shows, a proper response to some question propounded by the counsel for the prisoner; therefore, it is not now any cause for reversal of the conviction in this court.

The defendant's counsel asked the court to charge the jury, "1st. That if they believe from the evidence, that the deceased, P. C. Whittaker, followed defendant from the house, with intention of inflicting on him, said Hinton, any bodily harm, and used such language and gestures as might reasonably induce Hinton to suppose that Whittaker intended to assault him with

30

his pocket-knife while he was going away from the house; if he, Hinton, under the sudden impulse of the moment, and in close proximity to Whittaker, influenced by sudden resentment or terror, without cool reflection, impelled by sudden motion, committed the homicide, the act would be manslaughter, and not murder.

"2d. That if Hinton had reasonable cause to believe, from Whittaker's language and manner, as he, Hinton, withdrew from the house, that Whittaker was following and advancing on him, intending to assault him, or do him some bodily harm in his retreat; if Hinton fired with the intention of arresting Whittaker's assault, the act could only be considered manslaughter, and not murder.

"3d. That if the jury believe from the testimony, that the prisoner, at the time of discharging his pistol, had reasonable grounds to believe that the deceased intended to inflict on him some serious bodily injury, and that deceased was in such a position that he might have carried his intention into effect, and acting under such apprehensions, the defendant gave the mortal wound, the act would be excusable, on the ground of self-defence."

The first charge was given by the court, the second and third refused, which is assigned now, as error.

Without discussing the legal accuracy of the first charge, its being given, was certainly favorable to the prisoner. The second leaves out entirely, "sudden passion or impulse," which is the necessary element of manslaughter, under our Code, and for that reason the court did not err in not giving it.

The objection to the third charge asked, is, that it is too loose and indefinite to convey to the jury a correct idea of the principle of self-defence, whether it be considered as an abstract proposition, or in reference to the facts in proof. The reasonable belief that Whittaker intended to inflict on him some serious bodily injury, must be founded in part upon some act of Whittaker, (other than his merely being "in such a position that he might have carried his intention into effect,") showing that he,

Whittaker, had the present intention to inflict the injury. Even then, to excuse or justify the defendant, the means used to repel the assault of Whittaker, and prevent the impending injury, must have been only such as were necessary under the circumstances. Suppose A. has reasonable grounds to believe, and does believe, that B. intends to kill him the first time they meet. They afterwards do meet, both armed, and near enough to put B. in a situation to carry out his intention. Now if B. makes no demonstration of then carrying out such intention, A. is not justified in killing him. And if he does make such demonstration, but with means, and under circumstances of incapacity caused from personal debility, such as render it obviously unnecessary for the person assaulted to take his life, in order to protect himself from harm, then A. would not be justified is such unnecessary killing. The charge is evidently defective in not guarding these important points in the doctrine of self-defence.

This charge, had it been properly framed, would hardly have been applicable to the facts in proof. The defendant had put himself in the wrong, by his conduct towards the deceased and his wife, in their own house, and still further in the wrong, by refusing to go out of the house when requested by them. Whittaker had a right to put him out of the house; he had a right to go along with him to the steps of the entrance, with his hand on his shoulder, and to tell him that he would make him go; and he had a right to take out his knife, for his defence, against a man armed with a pistol, who had shown his readiness to use his arms recklessly. The defendant, by his own conduct, had made all this necessary and proper on the part of Whittaker. What else was done which put him in a position to have the right to act on the offensive, by shooting the deceased the moment he, Hinton, left the steps, or while still on the gallery? Was he in danger of being cut with the knife? There is no evidence that Hinton saw the knife, or acted with reference to any danger from the knife, when he did shoot. And there is not the slightest evidence, that Whittaker intended to assault Hinton with the knife. For the witness, who states that the knife was " open or half

open," also states that he did not attempt to use it; that it was a common pocket-knife, and was in in his right hand, as his arm hung down by his side; that the deceased had his left hand on the defendant's shoulder or back, walking behind him, and that when they reached the front gallery, Hinton turned, pushed Whittaker back, and fired and ran. There had nothing happened previously, to show that Whittaker intended to do more than put him out of the house; for he had repeatedly besought him, while shedding tears, to leave and go home ; and had been goaded into the resolution of putting him out of the house, only by the unreasonable replies of Hinton. Furthermore, it was shown, that Whittaker was extremely debilitated from drinking some time previously, and for that reason alone, it does not appear that it was necessary for Hinton's defence, that he should resort at once to the extreme remedy of shooting.

Thus the facts in proof show, that Whittaker, while doing a lawful act in a lawful manner, was killed by Hinton; and there is not a fact proved, which tends to establish the contrary, or that Hinton had reasonable ground to regard Whittaker's acts in any other light, than as the exercise of a lawful right, done in a lawful manner.

Hinton having placed himself in the wrong, in refusing to go out of the house until he got ready, was bound to submit to the force, reasonably necessary to put him out. His right to resist the force of Whittaker, would not be called into existence at all, until Whittaker used, or was in the act of using, or being then manifestly about using, more force than was necessary to put him out. And then Hinton would have the right to resist, but only to the extent, and by the use of the means, necessary to repel such excessive force so used or impending.

Such are the rules applicable to the facts of the case, and are very different from the third charge asked and refused. There was no part of the original charge of the court prejudicial to the defendant. Murder, in its different degrees, as well as man-slaughter, were properly explained.

We cannot say that the facts do not warrant the jury in the

conclusion, to which, under the charge they must have arrived, that the act of killing was done with express malice.

Judgment affirmed.