G. A. YANTIS v. THE STATE.

No. 3436.     Decided February 21, 1906.

**1.—Murder in the Second Degree—Continuance—Diligence—Want of Diligence.**

Where upon trial for murder defendant's application for continuance showed that one of his witnesses was beyond the limits of the State, and then in a State in which there was no officer to take the depositions of said witness, and that no other process could have been issued to procure witness before leaving the State,

there was no lack of diligence. See opinion for facts which showed want of diligence in defendant's motion for continuance as to other absent witnesses.

**2.—Same—Continuance—Want of Diligence—Motion for New Trial—Statutes Construed.**

Under our statutes and decision regarding continuances, where the application has been overruled because of the failure to show diligence: after trial and conviction, another rule prevails; that is, notwithstanding the failure of the application to disclose proper diligence, if on a review of the whole case, in connection with the testimony of the absent witnesses, it shall appear that the evidence of the witness named was of a material character, and the facts set forth in the application were probably true, a new trial should be granted.

**3.—Same—Materiality of Testimony—Isolated Facts—Record.**

Where upon appeal from a conviction of murder, it appeared that the application for continuance probably failed to show the materiality of the testimony of absent witnesses, or did not state that the testimony was material to controvert certain points put in issue by the State, yet where a motion for new trial was overruled which was predicated upon the action of the court in overruling the motion for continuance, this court is authorized to look to the testimony of the witnesses in the record, and consider same in connection with the testimony set out in the application for continuance, to determine the materiality and probable truth of such absent testimony.

**4.—Continuance—Materiality of Testimony—Uncommunicated Threats.**

Where upon a trial for murder the application for continuance stated that defendant proposed to show by the testimony of the absent witnesses the dangerous character of deceased, etc., and also to show that one of the State's witnesses, and son of deceased, was a petit thief from which accusation the difficulty arose; and that said latter witness was not on the inside of the hotel near which the homicide occurred as said witness would testify, etc.; and the court overruled said motion because defendant did not rely upon communicated threats by the deceased, etc. Held error, and that defendant could prove, if there were uncommunicated threats, the dangerous character of deceased as a man likely to execute such threats, to show who was most likely the aggressor in the difficulty. Besides the testimony set out in the application for continuance was to discredit the State's witness and son of deceased, and was therefore material for defendant. BROOKS, Judge, dissenting.

**5.—Evidence—Contradicting Testimony.**

Where upon trial for murder the application for continuance showed that the defendant proposed to prove by the testimony of the absent witness that one of the main State's witnesses could not have seen and heard what he testified to with reference to the difficulty between defendant and deceased, and was not present at the time when he testified he was; such testimony was material to contradict said State's witness, and upon motion for new trial it was error not to have granted same on account of said absent testimony, although the motion for continuance was overruled for want of diligence.

**6.—Motion for New Trial—Continuance—Materiality of Testimony—Diligence.**

Upon a trial for murder where defendant was convicted of murder in the second degree and relied both on manslaughter and self-defense and where the testimony of one of the principal State's witnesses was to the effect that he interfered, caught hold of defendant and told him not to kill the deceased; whereupon defendant told him to turn him loose, that he was going to kill the son of a bitch; testimony set out in the motion for continuance which tended to show that this did not occur; that this language was not used, in fact that said State's witness was not there at the time, would meet the question of malice aforethought involved in murder in the second degree, and it was therefore material and might have changed the result of the trial; and the court should have granted a new trial notwithstanding the lack of diligence on part of defendant in procuring the attendance of his witnesses.

**7.—Charge of Court—Amount of Force Authorized in Ejecting Intruder on One's Premises—Self-Defense.**

If A goes to the house of B, with an open knife in his hand and curses and abuses B in his own house no matter what about, B has a right to request him to

Vol. 49 Crim.—26.

leave his house. If B apprehends danger from A in insisting on his rights, it is B's privilege to arm himself and go with A and demand that A do leave, and if under such circumstance A refuses to leave and draws a deadly weapon on B, puts his life or person in danger of serious bodily harm, B has a right to defend himself. See opinion for charges requested embracing the above proposition which should have been given. Brooks, Judge, dissenting.

Appeal from the District Court of Wilbarger. Tried below before the Hon. S. P. Huff.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The following statement of the Assistant Attorney-General is substantially correct.

The evidence substantially shows the following facts: appellant was the keeper of a hotel in the town of Childress. Deceased's minor son worked at the hotel a day in place of one of the regular employees of the hotel. While working at the hotel appellant accused the son of the theft of a pair of cuff buttons. For that reason he refused to pay for his services and informed him that his services were no further needed. The boy denied that he was guilty of the theft of the buttons. Appellant insisted that he was, and related to him the circumstances under which the buttons were missed, contending that the circumstances showed his guilt. The boy reported the fact that appellant had accused him of the theft of the buttons to his father, deceased. Deceased who was not personally acquainted with appellant, immediately, in company with his boy, about 14 years of age, went to the hotel of appellant and demanded an explanation of appellant as to why he had accused his son of the theft of the buttons. Whereupon appellant ordered deceased out of his hotel. Deceased had a knife in his hand, and according to the State's evidence he made no attempt to assault appellant with it. When he was ordered out of the hotel by appellant he stepped out on the sidewalk in front of the hotel. While standing there, appellant secured a pistol from the office of the hotel, went to the door and shot deceased. He died immediately without making any statement. There were several eye-witnesses to the killing. The State's testimony unquestionably shows murder in the second degree: it neither raised the issue of manslaughter nor self-defense. All of the eye-witnesses testified in favor of the State's theory. Appellant admitted deceased came to the hotel and asked for an explanation of his conduct, accusing his son of being guilty of the theft of the buttons. He testified that deceased had a knife and threatened to assault him with it while in the hotel. He further testified that at the time he shot deceased, he believed deceased was about to make an assault upon him with a knife, and that he was also afraid deceased would take the pistol from him and shoot him with it. The court submitted murder in the first and second degree and manslaughter, and self-defense, predicated upon actual and apparent danger.

R. W. Hall, J. E. Yantis, Wynne & Blanks, for appellant.—On question of motion for new trial after application for continuance has been

overruled: Mitchell v. State, 36 Texas Crim. Rep., 279; Hammond v. State, 28 Texas Crim. App., 413.

*Howard Martin,* Assistant Attorney-General; *Harry Mason,* District Attorney, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at imprisonment in the penitentiary for a term of five years; hence this appeal.

Appellant made a motion for continuance which was overruled. After conviction he made a motion for new trial, and among other assignments, is the error of the court in refusing to grant the continuance. This motion for continuance is based on the absence of the following witnesses: Tom Jeffries, Dan Riley, Miss Ruth Denton, Frank Segars, and Arch Rouser. The diligence shown as to the witness Jeffries is the issuance of process to Childress County, where he is alleged to have resided, on November 23, 1904. The case was then pending in Childress County, the indictment having been returned on November 22, 1904. Appellant says that said process could not be executed on account of the witness having left the State of Texas about the time process was issued, and gone to the State of Arkansas with a car load of mules, where he then was. It is alleged that witness' family still resided in Childress County, and he was expected to return there soon. He further states that the witness was moving around in Arkansas, and he could not get depositions to him. It is further stated that there was no commissioner of deeds for Texas in said State of Arkansas, and no officer in Arkansas who had authority to take the deposition of said witness. Although the court says in his explanation that the diligence used for Jeffries was not sufficient though he did not overrule the application alone on that ground, the diligence used for this witness was sufficient. Appellant alleges that Dan Riley resided in Childress County. We do not believe the diligence as shown was sufficient. However, the district attorney, with permission of the court, offered to allow appellant to read the testimony of this witness, which had been taken on habeas corpus trial, to the jury and admit its truth. This appellant seems to have declined. So the application as to him passes out. The application shows that Frank Segars resided in Childress County; that no process was issued for this witness until February 6, 1905. No excuse is shown for the failure of the appellant to have process issued sooner. It also appears in this connection that said witness was then detained in a smallpox camp. The court strongly suggests in his explanation that the process was only issued for this witness after he had been employed to take care of the smallpox cases at the detention camp. It is further stated that the testimony of said witness would be of an impeaching character. We do not believe the diligence sufficient as to this witness. Nor do we believe the diligence used as to the witness Arch Rouser was sufficient. Nor does it occur to us that the diligence used to procure the attendance

of Miss Ruth Denton was sufficient. The application shows that at the
time of the homicide Ruth Denton resided in Childress County; that a
short time thereafter she removed to Fort Worth, Tarrant County; that
a subpœna was issued and forwarded to the sheriff of Tarrant County
for said witness on the 2nd of November, 1904, and was returned by the
sheriff of Tarrant County on November 25, 1904, "not executed, wit-
ness not found in Tarrant County." It further stated he was informed
and believed that said witness did reside in Tarrant County, but was
absent temporarily at Mineral Wells, but defendant has been unable to
locate her residence definitely. The court explains that the application
does not show any effort on the part of appellant to locate defendant's
witness at Mineral Wells. Nor is any diligence shown for the procure-
ment of this witness after the return of this process on November 25,
1904; that even when the case was called for trial, appellant did not ask
for process for said witness. As stated we do not believe the diligence
shown for this witness was sufficient.

However, under our statute and decisions regarding continuances,
where the application has been overruled because of the failure to show
diligence, after trial and conviction, another rule prevails; that is, not-
withstanding the failure of the application to disclose proper diligence,
if on a review of the whole case, in connection with the testimony of
the absent witnesses, it shall appear that the evidence of the witness or
witnesses named was of a material character, and the facts set forth in
the application were probably true, a new trial should be granted.
White's Ann. C. C. P., art. 597, sub. 6, and sec. 642, sub. 2; Harris v.
State, 18 Texas Crim. App., 287; Irvine v. State, 20 Texas Crim. App.,
12; McAdams v. State, 24 Texas Crim. App., 86. It may be that the
application for continuance, at least as to some of these witnesses, fails
to show the materiality of their testimony, in that the application states
as to said witnesses that they would prove certain isolated facts, but
does not state in that connection how such facts became material; that
is, that they were material to controvert certain points put in issue by
the State or to rebut the testimony of certain witnesses. See Bowman v.
State, 40 Texas, 10; Bruton v. State, 21 Texas, 337; Winkfield v. State,
41 Texas, 148. However, we understand, after the trial of a case and
a new trial is asked predicated on the action of the court overruling
motion for continuance, the court is authorized to look to the testimony
of the witnesses in the record in order to determine what they testified,
and then to consider the testimony of the witnesses as shown in the
application, and in connection therewith to determine the materiality
and probable truth of such absent testimony. White's Ann. C. C. P.,
sec. 643, notes 1, 2, 3, and 4, and authorities there cited.

Now, taking up these witnesses, does their testimony appear to be
material and probably true, and such as might be calculated to change
the result on another trial? Appellant proposed to prove by witness
Jeffries that he was well acquainted with W. L. Johnson (deceased—and
his boy Luther Johnson) ; that deceased was a man of violent disposition

and likely to put into execution any threat made by him, or to carry out any purpose formed by him; that he was a very large man, weighing over 200 pounds. Furthermore that he was well acquainted with Luther Johnson and knew him to be a petty thief, stealing from various parties small articles; and that when accosted by the owner of such property he would report to his father, and his father would take it up and cause trouble; that deceased was a dangerous and boisterous man; that after the homicide had been committed he heard witness Luther Johnson state that he was not on the inside of the hotel, could not state what occurred on the inside and knew nothing about the trouble, except he knew his father was going to raise hell when he went into the hotel, but that he saw no part of the difficulty until his father reached the door where the shooting occurred. The application states that this testimony would become material because said witness, Luther Johnson, would testify that he was on the inside of the hotel and back in the wash-room some fifty feet from the front door with his father at the time the difficulty began between defendant and deceased, and that he witnessed everything that occurred from the beginning of the difficulty to its final termination. The court explains this testimony as to Jeffries, to the effect that the dangerous and desperate character of deceased would not be material, because defendant did not rely upon communicated threats made by said Johnson. It does not occur to us that defendant in this respect was restricted to communicated threats. If there were threats of an uncommunicated character, he could then prove the dangerous character of deceased as a man likely to execute such threats, in order that the jury might determine, who was most likely the aggressor in the difficulty: both what occurred in the wash-room and what occurred at the time of the killing.

Again, the court says that the remainder of his testimony was to impeach and contradict witness Luther Johnson, as to whether he was in the hotel at the time his father first accosted defendant in the wash-room. It appears that no one, except appellant himself testified as to what occurred between him and deceased in the wash-room. Others heard loud talking in there, but none knew what was said. Not only this witness, but the testimony of several others tended to show that this witness, Luther Johnson, was not in the wash-room, as testified to by himself. So it would seem that the State regarded his presence in there as material. This witness says he was in the wash-room at the time his father cursed defendant for a son of a bitch; and he does not show that his father accosted appellant about the buttons. The witness denied that his father made any attempt whatever to use his knife on appellant, but denies this. Now, it would seem to us, under the circumstances, that the testimony of Luther Johnson was material for the State, and that all testimony tending to discredit him was also material for the defendant. His admission or statement to the witness Jeffries that he did not go in the house; that all he saw of the difficulty was on the outside was admissible and important testimony for appellant. It would appear to

have been important also to have shown by this witness his knowledge of the character of Luther Johnson as being a petty thief, inasmuch as this difficulty arose out of an accusation made by appellant against Luther Johnson to that effect. What has been said with reference to the testimony of Jeffries, applies to that of the testimony of the absent witness, Frank Segars.

As to the witness Miss Ruth Denton, appellant says he expected to prove by her that deceased came in the hotel alone; that Luther Johnson (his son) was not with him; that she heard him inquire for defendant, and upon being informed defendant was back in the wash-room, he passed in at the door; and she knows witness Luther Johnson was not with deceased; that after deceased had gone into the wash-room, she heard some loud talking, but could not distinguish what was said; and in a short while defendant came out of the wash-room, walking fast, and deceased came out of the wash-room after him; that deceased had a knife open in his hand; that defendant went behind the counter, and she saw him procure a pistol; that deceased was cursing, and witness immediately left, went back into the dining room, and saw no more of the trouble. After she went back in the dining room, after seeing defendant procure his pistol, she saw W. E. Bogart, sitting at the table in the dining room, eating his dinner, and saw witness Bogart leave the dining room by the side door, after she heard the pistol fire. Now, a reference to the record discloses that the testimony of the witness Bogart was very material for the State. He places himself in the office, talking with State's witness Fires prior to the difficulty. That he was present in the office when appellant returned and got the pistol from behind the counter, though he claims not to have seen Johnson as he passed through the office. However, he saw and heard the altercation between the clerk (Pixler) and appellant and the attempt made by Pixler, as testified to by him and Fires, to prevent appellant from coming out with the pistol after deceased, Johnson. He further testifies that he was rather between the door where the killing occurred and the counter where the altercation occurred between Pixler and appellant; that when appellant approached him, he attempted to prevent him from going out, and told appellant not to kill the man; and that appellant told him he was going to kill the son of a bitch. As stated, we regard the testimony of Bogart as perhaps the most important of any of State's witnesses. Neither Fires nor Pixler place Bogart in the office during the altercation, though both seem to have noticed him there before. While Fires testified that he attempted to interfere to prevent appellant from following deceased, he saw nothing of Bogart at the time, nor his effort to prevent appellant from going out after deceased. Nor did he hear Bogart tell him not to kill the man. Nor did he hear appellant declare that he was going to kill the son of a bitch. As stated, no other witness places Bogart in the office at that particular time, and no other witness relates what he testified as to his interference, except himself. Both Fires and Pixler state they saw no such conduct and heard no such language. We would

also observe that appellant himself in his testimony contradicts Bogart. This witness states that appellant broke loose from him, went to the door and he turned his back, and heard the pistol fire; that he could see the man just before he turned his back standing on the sidewalk; that he did not see that man do anything at all; did not see him move his hands, or say anything. This witness was further asked, if he did not before the difficulty go back into the dining room, and if he was not in the dining room when the shooting occurred, eating his dinner, and if he did not immediately afterwards leave by the south door and go off on his bicycle, which he denied. The court says, "that this testimony, except what is absolutely uncontroverted by the State, is in the nature of impeaching testimony, as to Luther Johnson and Bogart; and that if the witness had been present and testified that Bogart was at the table in the dining room eating his dinner, after seeing appellant procure his pistol, is in the opinion of the trial court not probably true, because it is practically an uncontroverted fact that Bogart was in the office, talking to Judge Fires at the time defendant came from the wash-room, and went behind the counter to get his pistol. It is also practically an uncontroverted fact that deceased followed defendant from the wash-room into the office with a knife in his hand." Perhaps, if the matters referred to by the court, were uncontroverted facts in the case; that is, facts agreed to, or even so overwhelmingly proven as to appear to be conceded facts, his explanation would control. We have examined the record very carefully to see if any other witness, either Fires or Pixler (the other two eye-witnesses) testify that Bogart was in the office at the time appellant pursued Johnson to the door with the pistol; and neither of said witnesses appear to have seen Bogart there at that particular juncture. They saw him shortly before, it is true, but at the crucial point neither of said witnesses place him there; neither of said witnesses testify or agree that they saw him interfere to prevent appellant from pursuing Johnson. Neither of said witnesses saw him take hold of appellant nor heard him tell appellant not to kill the man. Nor did either hear appellant say to Bogart, "I will kill the son of a bitch." As a matter of importance in this connection, the witness Bogart himself testified that he did not see Johnson come into the office with the knife in his hand, after Yantis had come in and walked behind the counter; nor did he see Johnson pass through the office on his way to the door, nor did he hear appellant tell Johnson to get out of his house, and hear Johnson reply, "I will not leave here until this damn thing is settled." Both of said other witnesses testified to these facts. This occurred immediately in connection with, and just before the killing, and yet the witness Bogart did not hear or see any of this; but makes a statement in connection with his interference and what was said, that neither of the other witnesses saw or heard. Now, the jury may have believed Bogart as against the other two witnesses, Fires and Pixler, and it is probable they did; or they would have believed him notwithstanding the testimony of Miss Denton, yet, in our

opinion, her testimony would reinforce that of Fires and Pixler, and would tend to show that Bogart was not present at the time when he testified he was, and was then in the dining room, and could not have seen and heard what he testified to. This was not impeaching testimony but upon a material fact was contradictory of the witness Bogart. The rule authorizing a new trial on account of absent testimony, a continuance having been overruled because the diligence was insufficient, appears to be rather exacting. "It is well settled that it is not in every case where the alleged absent testimony is material and probably true that the ruling of the trial court refusing a new trial will be revised on appeal when considered with reference to overruling the application for continuance. 'It is only in a case where from the evidence adduced upon the trial we would be impressed with the conviction, not merely that the defendant might probably have been prejudiced in his rights by such rulings, but that it was reasonably probable that if the absent testimony had been before the jury, a verdict more favorable to defendant would have resulted.'" See Goldsmith v. State, 32 Texas Crim. Rep., 113, and authorities there cited.

Now, it will be borne in mind that appellant relied both on manslaughter and self-defense. He was given murder in the second degree with the punishment assessed at five years confinement in the penitentiary, and he adduced testimony tending to show both manslaughter and self-defense. Bogart's testimony was unquestionably the most emphatic, tending to show a predetermination to kill deceased. He stated that he interfered and caught hold of appellant, and told him not to kill the man. Whereupon appellant told him to turn him loose, that he was going to kill the son of a bitch. Now, it occurs to us that any testimony that would strengthen appellant's defense, as tending to show that this did not occur; that this language was not used, in fact that Bogart was not there at the time, would meet the question of malice aforethought involved in murder in the second degree and insisted on by the State. Of course, we are not prepared to say that said testimony would change the result, but it does appear to us that by being deprived of the same, appellant was prejudiced to that extent in his rights. What a jury would probably do with this additional testimony is more or less speculative. But evidently this testimony would be favorable to appellant and the jury might be inclined to take a different view of the case. Accordingly we hold that, notwithstanding the lack of diligence in procuring the attendance of the witnesses mentioned, the court should have granted a new trial.

Appellant also complains that the court erred in refusing to give his special requested instructions numbers 1, 2 and 4. These charges relate to the right of appellant to protect himself and his hotel from unlawful intruders, and to eject deceased therefrom when he became disorderly and refused on request to leave said hotel. We quote charge number 1, as follows: "You are instructed that if you believe from the evidence deceased entered the defendant's hotel and made an assault

upon defendant with a knife; then you are instructed that the defendant had a lawful right to arm himself for the purpose of ejecting said Johnson from said hotel, and you are instructed that if said Johnson, deceased, refused to leave said hotel, and stood just in front of same, holding the screen door open with his foot or otherwise, then defendant would have a lawful right to follow up to where he was and eject him entirely from said hotel; and if you believe defendant undertook so to do, and that deceased did any act that reasonably appeared to defendant that deceased intended to inflict death or serious bodily harm upon defendant, as it appeared to him at the time, and he thereupon shot deceased, you will return a verdict of not guilty." Special charge number 2 is as follows: "You are further instructed that, if you believe from the evidence that deceased Johnson entered the defendant's hotel and made an assault upon him with a knife, or that he expressed his intention not to leave and presented a knife in his hand, then you are charged that the defendant had a lawful right to arm himself and to follow deceased out of said hotel on the gallery of same, and request him to leave, and if you believe that he followed out of said hotel on the gallery for such purpose, and that the deceased then presented an open knife and made any motion that reasonably appeared to defendant that he intended to kill him or inflict serious bodily injury upon him, and that thereupon defendant shot and killed him, you will return a verdict of not guilty." The State insists that the charges here asked were in effect given by the court in the general charge, and so the requested charges were not necessary. The charge given by the court, which is claimed to be on this subject, reads as follows: "If you believe defendant armed himself for the purpose of defending himself against an attack or an anticipated attack from the deceased, and thereafter he went to the door of the hotel with no intention on his part to renew the difficulty, or to bring on a difficulty with deceased, or if he went to the door, if he did so, for an innocent purpose, or only for the purpose of seeing that the deceased had left, or was going to leave the premises, and, if while there it reasonably appeared to defendant, viewing the facts from his standpoint at the time, that he was in danger of losing his life or of suffering serious bodily injury at the hands of the deceased, and you find that the defendant, acting under such apprehension, shot and killed deceased, then and in that event defendant would be justified, and he would not be required to retreat in order to avoid the necessity of killing deceased, and you should in such event acquit defendant, although in fact the danger was not real but only apparent." It will be seen that this charge as given is prefaced with the idea that appellant must have armed himself for the purpose of defending himself against an attack or an anticipated attack from deceased. It is contended that defendant did not have to arm himself to resist an attack by deceased, but that he had a right to make deceased leave his hotel, if he was acting in a boisterous and unruly manner, and he had a right to arm himself in order to make him go, as some of the testimony shows he refused to

go. Of course, in a subsequent portion of the charge, the jury was instructed that appellant would have the right, in case he had armed himself to protect himself from an attack by deceased, to go to the door for the purpose of seeing that deceased had left or was going to leave the premises; and if after going to the door, deceased made an attack on him, he would have the right to shoot him. But, it is claimed that the vice in the qualification at the beginning of the charge, still pervaded the whole charge. We are not prepared to say that it did not. In our view, the requested charges would have directly called the attention of the jury to that phase of appellant's defense, and would have instructed the jury that appellant had a right, if he apprehended any danger, to arm himself, to compel deceased to comply with his request to leave the house. In the language of Judge Roberts in Hinton v. State, 24 Texas, 454, "Where a party has put himself in the wrong in one's house, and refuses, when requested, to leave the house, the owner has a right to make him go. He has a right to go along with him to the steps of the entrance with his hands on his shoulder, and tell him he would make him go, and he has a right to take out his knife for his defense against a man armed with a pistol who had shown his readiness to use his arms recklessly." And see Dyson v. State, 14 Texas Crim. App., 454. Of course, no man has a right to kill another because such person refuses to leave his house. But as we understand the principles of law governing a case of this character; if A goes to the house of B, with an open knife in his hand, and curses and abuses B in his own house, no matter was about, B has a right to request him to leave his house. If B apprehends danger from A, in insisting on his right, it is B's privilege to arm himself and go with A and demand that A do leave, and if under such circumstances A refuses to leave and draws a deadly weapon upon B, puts his life or person in danger of serious bodily harm, B has a right to defend himself. This phase of the case arises from appellant's testimony. Of course, it is not our purpose to decide that this phase of the case is correct, but appellant had a right to a fair and definite charge on this subject. We believe that one or the other of the requested charges embraced the proposition correctly and should have been given.

We do not deem it necessary to discuss other matters raised; but for the errors pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

BROOKS, JUDGE (dissenting).—The overruling of the application for continuance and the denial of a new trial on that account shows no material error. The absent testimony is barely impeaching, and this never authorizes a continuance. To what extent it is not impeaching it is neither material nor probably true in the light of this record. The qualification of the trial court to the bill of exceptions on the motion for continuance shows that the testimony was merely impeaching, and

not probably true. The majority opinion does not come within the rule announced and quoted in the majority opinion from Goldsmith v. State, 32 Texas Crim. Rep., 113—"It is only in a case where from the evidence adduced upon the trial we would be impressed with the conviction, not merely that the defendant might *probably have been prejudiced in his rights by such rulings,* but that it *was reasonably probable that if the absent testimony had been before the jury, a verdict more favorable to defendant would have resulted."*

The charge of the court complained of, and upon which apparently this case is reversed is full and complete and in all material points follows Hinton v. State, 24 Texas, 454, cited by the majority. It cannot be ascertained reading the majority opinion whether the case is reversed on account or this charge or not, and the writer is in ignorance on that subject. Furthermore the majority say, "We are not prepared to say that the charge is not erroneous." I understand that article 723, Code Criminal Procedure, requires us to say that the charge was calculated to injure the rights of appellant before we are authorized to reverse. I understand the rules of this court require us to decide whether a charge is correct or incorrect. As a matter of fact it cannot be said that the charge is legally wrong; and the charges suggested by appellant would not have strengthened appellant's rights and defenses. I therefore cannot agree to the reversal of this case.