STATE OF WEST VIRGINIA

*v.*

MATILENE DEAN

(No. 10167)

Submitted January 17, 1950. Decided April 4, 1950.

*W. F. Damron, O. D. Damron,* for plaintiff in error.

*William C. Marland,* Attorney General, *Thomas J. Gillooly,* Assistant Attorney General, for defendant in error.

RILEY, JUDGE:

Matilene Dean was indicted in and tried before the Circuit Court of Logan County, and convicted of murder of the first degree without recommendation. To the judgment of the circuit court based upon a jury verdict, sentencing her to be hanged at the state penitentiary at Moundsville, defendant prosecutes this writ of error.

The defendant, a negro woman twenty-three years of age, and a native of Logan County, residing at the village of Stowe, early on the morning of November 8, 1948, shot and killed Mack Nixon, commonly known as "Shamrock," and sometimes referred to by that name in this opinion. Until about a year prior to the homicide she resided with her mother in the village of Shamrock in Logan County.

Thereafter and until she was arrested she resided with and worked as housekeeper for one Sam Richardson, a widower, for fifteen dollars a week at the Richardson home in the village of Stowe, located on Buffalo Creek, approximately fifteen miles from the City of Logan.

On November 7, 1948, defendant left the village of Shamrock by bus late in the afternoon and arrived at Logan a short time later. Again boarding a bus at Logan about 7:30 on the same evening, she arrived at Stowe after dark about 8:55 that night. Upon alighting from the bus at or near the village of Stowe, she saw a man on the highway acting "strangely," which prompted her to stop at the home of Richard Coleman, who lived a short distance from the Richardson home. She asked Coleman to turn on his light so she could see her way to the Richardson house. While talking with Coleman, the decedent Nixon, approached her through the darkness and called "Matilene," whereupon defendant identified herself and inquired if the person was "Shamrock." Nixon, who had a flashlight informed defendant that he was going to the Richardson house, and the two then proceeded there, where they found Richardson in his work clothes preparing to go to work. Decedent offered Richardson a drink of whiskey, which was declined. Then defendant in the presence of Nixon asked Richardson how much money he would draw the following Saturday, and took from her purse a statement which purported to show the money due, along with eighteen dollars in United States currency. When Richardson was ready to go to work, defendant and Nixon accompanied him to a place called the "grill" located near the highway between Stowe and the village of Lundale, where Richardson got on the bus for the purpose of going to his working place.

After Richardson got on the bus, defendant left decedent and began walking toward the village of Lundale, assigning in the record as her reason for not returning to the Richardson home with decedent that she was "afraid to go back, he was acting so funny." At Lundale she went to the home of Marie Redley (sometimes spelled "Ridley"

in the record), a friend. About five minutes later Shamrock followed her into the Redley house and "started talking loud." Defendant says when she asked decedent to be quiet, he began to "curse and go on," and that she walked out of the house and left him there. Marie Redley, although summoned, did not appear to testify. Defendant then went to the nearby home of Tom Hall, and upon knocking she was admitted by Hall, who at the time of the trial was dead. As defendant walked into the Hall home, she was followed by decedent who was "cursing and going on." Defendant testified that when she asked Shamrock "What do you mean cursing me, you make people think I am something to you," he "slapped me and my nose bled." Defendant says that decedent then called Hall a vile and insulting name and said, "Do you want to take that up?" Hall then got a .22 caliber rifle from the closet. Defendant left the two during the argument which ensued, and "didn't stop." Proceeding to her home, she locked the doors, sat down and wrote two letters. Then examining to see that the doors were locked, especially the kitchen door, she went to bed and fell asleep.

Defendant testified that she next saw decedent in her bedroom, standing over her bed, holding a shot gun; and that when she asked, "Sam, is that you?", decedent replied, "Shut up, G— damn you, shut up, I will blow your G— damned brains out." Defendant then said, "If I have anything you want, just take it," and got out of bed, opened her wardrobe, and, according to her testimony, found her pocketbook was missing. Defendant asked decedent for her pocketbook, and he said he did not have it. Then she accused decedent of breaking into her house, which he denied, saying "your house was already open." Defendant called over to Mrs. Leeper, her closest neighbor, who lived in a house thirty-five or forty feet away from the Richardson house, told her what had happened, and asked her and her husband, William Leeper, to come over as "This man came over here and broke in my house"; but Mrs. Leeper's only response was, according to defendant, "What man, can't you get him out?" After a "good argument" with decedent, defendant says she went

over and knocked on the Leeper's door, but the Leepers refused to help her.

Thereafter defendant ran down to the Coleman house, and tried to get Coleman to take her to the state police, but was told he did not have enough gasoline. She then borrowed two nickels from Mrs. Coleman so that she could call the "States," evidently meaning the state police. Next she proceeded to a neighboring house, occupied by a Mr. Myers. There she tried unsuccessfully to call the state police, but the telephone was out of order. Meanwhile the decedent was standing "up there cursing." Going to another nearby house, occupied by Pete Zanders, she told Zanders what had happened, but Zanders, having been informed by defendant that decedent had taken Richardson's shot gun, refused to go to the Richardson house, but drove defendant to Lundale to the residence of one William Mosley, a constable of Triadelphia District, Logan County, and asked the constable to arrest decedent. Mosley told defendant he would "Be right on down." Upon having been driven by Zanders to the vicinity of the Richardson home, defendant went to the Leeper home, stayed four or five minutes, and then went into the Richardson house, but found no one there.

Shortly thereafter defendant went again to the Coleman house, and told Mrs. Coleman that Richardson's money, gun and whiskey were missing. From the Coleman house, defendant proceeded in the direction of Lundale to the home of a Mrs. Moore. She gave Mrs. Moore the two nickels Mrs. Coleman had given her, and tried again to call the state police from that place, but received no response. She then proceeded to the nearby home of Annie Arthur, where decedent roomed and told Annie Arthur that "Shamrock broke into my house," and asked her, "Did he bring a gun?", to which the Arthur woman, replied, "No, sir"; but that decedent had been in and out of the house all night. Defendant found decedent at the Arthur home in bed, and asked him to accompany her home. She says she made this request "so when the laws come he would be there and catch him with my money."

When defendant and Nixon arrived at the Richardson home, she asked decedent to let her have the gun, and said that decedent could have the money. Nixon replied that he did not have the money, and upon searching for the gun (a 12 gauge shot gun), found it lying by the couch in the living room.

At this point we note that the events above narrated are uncontradicted, and are substantially corroborated in this record.

According to defendant, she took the shot gun and went out of the door leading to the porch, and then down to the bottom of the ten steps leading therefrom; that decedent followed her through the door with the .22 rifle in his hands, saying, "you son of a bitch, you bitch, you got the gun, haven't you, damn it, you accused me this morning, so I will kill you now"; that decedent pointed it at defendant and defendant said, "I just pulled this little long thing [evidently meaning the trigger of the shot gun] and the thing went off." Decedent fell, and the rifle, she says, fell on the porch beside him.

It seems that Leeper, hearing the shot, came over and met defendant at the gate.

Constable Mosley testified that when he arrived at the Richardson house shortly after the shooting, in response to defendant's call for assistance, he found two guns in the house, a single barrel 12 gauge shot gun, and a .22 caliber rifle; that the shot gun was standing a little to the left of the door, leading from the porch into the house as one enters it, about four feet from where decedent was lying. He identified the shot gun as one lying on the counsel table, and in answer to the inquiry whether there was "anything about the stock that would cause you to remember it, if you saw it?", he replied, "Up on top there, taped up." Mosley says that he left the rifle in the house, but took the shot gun and left it at the office of deputy sheriff Clyde Staley, and, without objection, he said that the sheriff brought the shot gun over to the court house.

Clyde Staley, a deputy sheriff of Logan County, testi-

fied that he found an empty shot gun shell lying on the upper side of the house between the Leeper and Richardson houses; and when asked where the empty shell was, the witness testified that it is "here in this shot gun. I picked it up and put it in." This witness testified that Mosley put this gun in the office of the justice of the peace at Man, and that "They turned it over to me, and I put the shell in the gun." In answer to further inquiry this witness testified again that the shell in the gun was the one which he found in the Richardson yard, and that it had been in witness' possession locked up ever since that day. Whereupon counsel for defendant objected to the introduction of the empty shell on the ground that the witness does not know "whether that shell was fired on that occasion or not." This objection was overruled, and the empty shell was admitted into evidence, to which ruling counsel excepted. After further inquiry of this witness, counsel stated that "We renew our objection to the introduction of the empty shell on the ground that it does not correspond with the one introduced by the State," which motion was overruled, and defendant by counsel excepted.

Leeper on direct examination testified that he saw Matilene "Richardson" place "the shot gun in the left hand corner of the porch;" and on rebuttal that she carried the shot gun up the steps "and she took it in and set it down on the right hand corner of the grate." This witness testified that after the shot was fired, he saw defendant break out the empty shell; that the shot gun was then placed or was thrown on the ground; but, as witness went up the steps to where decedent was lying, "she took it in and sat it on the left hand corner of the grate," and then came out on the porch past decedent's body and went down the steps.

Shortly after the shooting defendant was driven by a man whose given name was "Roosevelt," to the Mosley house for the purpose of surrendering. Arriving at the Mosley house, she learned from Mrs. Mosley that her husband had gone to Stowe in response to her previous call.

On returning home, she found the constable there, and he promptly arrested her, put her in his car, and took her to the city jail at Man.

William Leeper testified in contradiction to defendant's version of the shooting. He testified that he heard defendant and decedent quarreling "Back and through" the Richardson house over the lost money; that when he first heard them talking, he went to the foot of the bed, pulled back the side of the window shade at or near the foot of the bed; that he saw decedent coming around the corner of the house at the back thereof; that before he got to the window he heard decedent say, "Give you your money, Matilene, I don't have your money"; and that as decedent was running away from her, he said, "Matilene, what did you bring me down here for, get me up out of bed to kill me?", to which she replied, "Yes," and he ran away from her. The witness then testified that defendant walked slowly while decedent ran; that decedent turned around on the porch, facing defendant as if to walk down the steps, and said, "Matilene, you are not going to shoot me, are you?", and then the fatal shot was fired.

Mrs. Leeper testified that when defendant came to her home the second time (evidently after she had returned from her first trip to the Mosley home), decedent picked the shot gun up, and left her with nothing but three shells, which defendant then had in her possession, one of which she dropped on the floor of the Leeper house; that on that occasion defendant said, "If Bill Mosley was too long, if Bill Mosley didn't come in five or six minutes, she was going up and get him, if she had to fool him back down, if she didn't kill him."

Channie Coleman testified that when decedent came to her house the first time that she told her that "Shamrock had broken into her house and stole some whiskey and money out of her wardrobe, twelve dollars out of her pocketbook, and Sam's shot gun," and when she woke up he was standing over her with a shot gun, and he left her with two shells; that she then asked the Colemans to take her to the state police, but witness' husband told her he

did not have any gasoline. According to Mrs. Coleman, defendant walked the floor for a little while, and then said "I just don't know what to do, he has Sam's shot gun"; that "Sam loved that shot gun better than he does me. Shamrock hates me. I know what I will do, I will go up there and get him and tell him I am scared to come home; and ask him to come with me, and kill him before he gets there."; and that she said she was going to the state police, and she then asked the witness for a dime so she could call the state police from Mrs. Moore's house. She next returned to the Coleman house about ten minutes before five in the morning, telling the witness that she had killed the decedent; and that he was lying on the front porch dead, and stated that she was going to give herself up. That after Richard Coleman told her that he did not have gasoline enough to take her, and to get "Roosevelt" to take her up, defendant left.

The foregoing testimony of William Leeper, Mrs. Leeper, and Channie Coleman to the effect that defendant threatened in their presence to lure decedent to the Richardson house, and then kill him, is denied categorically by this defendant.

We have narrated the events portrayed in this record in detail, because the initial question presented to us in this most important case, which involves the life of a young woman, is whether there is sufficient evidence in the record from which the jury could have found, beyond a reasonable doubt that defendant was guilty of premeditated, deliberate and malicious homicide. From some aspects of the record, it seems that defendant had been greatly harassed by the decedent, but from another view of the record, it would seem that she prevailed upon defendant to return from the place of his residence, where he was in bed, and go to the Richardson home, for the purpose of killing him.

Code, 61-2-1, provides that "Murder * * * by any wilful, deliberate and premeditated killing * * * is murder of the first degree. All other murder is murder of the second degree." In *State* v. *Shelton,* 116 W. Va. 75, pt. 2 syl., 178

S. E. 633, approved by this Court in *State* v. *Boggs,* 129 W. Va. 603, 42 S. E. 2d 1, this Court held: "Where there was intentional use of a deadly weapon in producing the death of another, the jury may infer malice from the act." If we take the defendant's testimony in support of her case as true, a good portion of it, as heretofore indicated, is substantially corroborated, and also take as true her denial of the threatening statements attributed to her by William Leeper and his wife, and Channie Coleman, coupled with defendant's version of the actual killing, the circuit court would have had no other proper course to follow than to render a verdict for the defendant. But this record in the form of the testimony of William Leeper substantially contradicts in most important details defendant's testimony as to the events immediately preceding the killing. Undoubtedly, the defendant killed Mack Nixon with Richardson's 12 gauge shot gun. Likewise it is without substantial doubt that she thought decedent had stolen her money, and Richardson's shot gun and whiskey, and thereafter, having been imbued with that idea, when she tried to get the aid of the state police and actually asked Constable Mosley for assistance, which was promptly offered, the foremost thought in her mind, which would make almost impossible the idea that she entertained malice, was to obtain protection and assistance. If she had at any time entertained any premeditation to kill decedent, it would be reasonable to say that she would have killed him first, and then gone to the officer; but having summoned aid, she returned and is purported to have threatened to bring decedent to the Richardson home, and then kill him. These events, based on the testimony of Channie Coleman, William Leeper and Mrs. Leeper, are denied by defendant, but it is not for this Court, nor was it for the Circuit Court of Logan County, to say that the testimony is not credible. If it is credible, it was for the jury to believe or disbelieve it, and, further, if the defendant made the damaging statements and was in deadly earnest in doing so, as the jury would have the right to say, she then and there premeditated and deliberated to kill decedent. Notwithstanding

her testimony to the effect that she went to the Annie Arthur home, where decedent was in bed, for the purpose of bringing him back to the Richardson house in order that he might be arrested when the constable arrived, it was for the jury to say that her threats in that regard, made in the presence of three witnesses, were in the furtherance of her premeditation and deliberation to kill decedent. We think that, while the case may be close, the jury had the right to find or not to find beyond a reasonable doubt that the killing of Mack Nixon was premeditated, deliberate, malicious, and intentional. The jury also had the right to disregard any theory of self-defense, especially in view of the fact that there is uncontradicted evidence that the .22 caliber rifle was inside the door of the Richardson house at the time Nixon fell, and the trial court in his able conduct of this most serious trial, specifically instructed the jury on the question of self-defense.

There was no objection to the introduction of the testimony bearing on the identity of the shot gun brought into court on the day of the trial; but defendant, as heretofore indicated, objected to the introduction of the empty shell which deputy sheriff, Clyde Staley, testified he found lying on the upper side of the Richardson house between the Leeper and Richardson houses. While there may be some doubt that the empty shell found by Staley was the shell from which the shot which killed decedent was fired, the action of the trial court in overruling the objection is not reversible error in the circumstances of this case. We say this because this record clearly shows, whether we take as true the evidence introduced on the part of the State, or that introduced on the part of the defendant, that the defendant actually killed Mack Nixon. The issue in this case is not whether defendant killed decedent, but whether there is sufficient evidence of premeditation, deliberation and malice to justify a conviction of murder of the first degree. So even if the introduction of the empty shell was improper, the defendant was not prejudiced thereby.

Error is also assigned to the admission in evidence over defendant's objection of a written statement of the State's

witness, Channie Coleman, which statement was taken by the state police a day or two after the killing. State's witness, Channie Coleman, on direct examination, testified that on the night of the homicide the defendant said, "I just don't know what to do, he has Sam's shot gun, Sam loves that gun better than he does me. Shamrock hates me. I know what I will do, I will go up there and get him and tell him I am scared to come home, and ask him to come with me, and kill him before he gets there." This is the only testimony of this witness which tends to show deliberation or premeditation on the part of defendant. A few weeks before this case was called for trial defendant's counsel obtained a written statement from witness, Channie Coleman, in which no mention was made of the matter contained in her above-quoted testimony. When questioned by defendant's counsel on cross-examination as to the reason she did not tell counsel for the defendant about defendant's purported statement on the night of the homicide, Channie Coleman testified, "Because when he went to reading that, I told him that wasn't all was said, and he said, 'What else?', I said, 'She said Shamrock hated her', and he said, 'That wasn't necessary, that won't be called for in your statement at all.'" The prosecuting attorney on redirect examination of Mrs. Coleman moved the court to permit him to introduce in evidence the written statement taken by the state police, heretofore referred to, on the ground that the witness' testimony had been attacked. This action was evidently taken for the purpose of corroborating the testimony of the witness, and to show the prior statement to be consistent with the evidence given on the trial. The court ruled that the proffered statement was not admissible unless counsel for the defendant so desired. The defense objecting, the paper was not admitted at that time. Upon recross examination of Channie Coleman the statement given to defense counsel shortly before the trial was identified, and, without objection, was admitted and read. As heretofore indicated, this statement contained no mention of defendant's having made any statement in the presence of Channie Coleman in regard to killing decedent.

Channie Coleman's statement made to the state police, containing as it did the damaging recital bearing on the question of premeditation, when first offered by the State only served to corroborate the witness' testimony in that regard. It was self-serving and made without the authority or acquiescence of defendant. Clearly it was inadmissible, when first offered, and was properly refused. "The rule, without doubt, is that self-serving statements made out of court cannot be shown in order to corroborate the testimony of a witness. But there are well-established exceptions." *Cutchin* v. *City of Roanoke,* 113 Va. 452, 470, 74 S. E. 403, 405. See, generally, 39 Harvard Law Review 258; IV Wigmore on Evidence, Third Edition, Section 1126. But after defendant offered Channie Coleman's statement, made to defendant's counsel, which did not contain any recital bearing on premeditation, and the statement was read to the jury and the jury heard the witness testify as to the reason the statement omitted any reference to the threats purported to have been made by the defendant in the witness' presence, the statement made to the state police was properly admitted for the purpose of showing a purported attempt at fabrication and, in addition, the latter statement was admissible to let the jury have the benefit of the two materially different statements of the witness.

Defendant also assigns error to the trial court's action in giving to the jury State's instruction No. 2, which reads: "The Court instructs the jury that a woman is presumed to intend that which she does, or which is the immediate or necessary consequence of her act, and in this case if you believe from the evidence beyond all reasonable doubt that the prisoner, *Madeleine* Dean, with a deadly weapon in her possession, without any, or upon very slight provocation, gave to the deceased, Mack Nixon, a mortal wound, then the prisoner is *prima facie* guilty of wilful, deliberate and premeditated killing, and the necessity rests upon her of showing extenuating circumstances, and unless she proves such extenuating circumstances, or the circumstances appear from the case made by the State, then she is guilty of murder in the

first degree." Counsel for defendant objected to the giving of this instruction on the ground that it is not applicable to the case at bar, for the reason that the evidence shows that defendant, Matilene Dean, shot decedent upon provocation which was more than slight, as disclosed by the record. But whether under the facts and in the circumstances of this case the shooting was without any, or upon very slight provocation, or upon great provocation was for the jury to determine. If the evidence is sufficient, as we have indicated it is, for the jury to find beyond a reasonable doubt that defendant's killing of decedent, Mack Nixon, was premeditated and deliberate, it was proper to give the instruction. See *State* v. *Cain*, 20 W. Va. 679, pt. 2 syl.

Finally, defendant assigns error in the overruling of defendant's motion that the verdict be set aside and a new trial granted on the ground that one member of the jury, Clifford Burns, was disqualified to serve as a juror in the trial of this case. The factual matters bearing on this issue are set forth and contained in defendant's bill of exceptions No. 2.

Tilda Ellis, Deputy Circuit Clerk of Logan County, produced the official records of the clerk's office, and testified that Clifford Burns was a member of the jury which, on February 2, 1949, rendered a verdict that the defendant "Matilene Richardson" alias "Matilene Dean" was guilty of murder in the first degree as "charged in the within indictment." From the transcript of the evidence bearing on the question whether the juror, Clifford Burns, was disqualified, it appears that the juror, Clifford Burns, age twenty-nine years, on his voir dire was asked by the Judge of the Circuit Court of Logan County, with the other nineteen members of the panel "whether or not you were biased in favor of or prejudiced against the members of the Negro race?"; that he had heard that question asked a number of times at the same term of court before the Dean trial; that had he been prejudiced against members of the negro race he would not have been qualified to try the case; that he did not vote

to return a verdict of murder of the first degree against the defendant because of any prejudice which he entertained against members of the negro race; and that he did not make any statement at anytime which would indicate that he was prejudiced against members of that race. If the foregoing answers on the inquiry involving the motion to set aside the verdict had been untrue, and if his answer on the voir dire to the effect that he was not biased in favor of or prejudiced against members of the negro race had been untrue, he would have been guilty of perjury. See *State* v. *Justice*, 130 W. Va. 662, 44 S. E. 859; and *Ohio River Railway Co.* v. *Blake*, 38 W. Va. 718, 720, 18 S. E. 957. Having in mind the foregoing testimony of the juror, Clifford Burns, let us at this time review the evidence bearing on the issue of Burns' qualifications as a juror.

Joe Barbour testified that he operated a place at which soft drinks and beer were sold, in connection with a pool room at Peach Creek in Logan County; that on the Saturday night following the Matilene Dean trial he saw Clifford Burns in his place of business talking with one Parker Simpson, Marie Barbour, witness' wife, and John McLaughlin; that he saw Parker Simpson, Marie Barbour and John McLaughlin sitting at a table at which Clifford Burns was standing, conversing with them; and on that occasion the witness observed that Clifford Burns was not under the influence of intoxicating drinks. The witness, however, was not close enough to hear any of the conversation.

The witness, John McLaughlin, testified that he was related by marriage to Clifford Burns, his wife being Burns' second cousin; that Clifford Burns came from the counter over to the table at which he, Mrs. Barbour and Simpson were talking; that Mrs. Barbour asked Burns: "Are you the one that hung that woman?", and then inquired, "Why did you hang her, because she was a 'nigger'?", to which question Burns answered, "Yes,", whereupon the witness left the table and heard no more of the conversation.

Parker Simpson testified that while he was sitting at

the table with Mrs. Barbour and John McLaughlin, he heard Clifford Burns, while standing at the table with his hands thereon say, "If it was left up to me I would hang all them G— damned niggers"; and when asked by Mrs. Barbour, "What would you want to do that for?", he said "something about the penitentiary was running over already." This witness testified that he heard Mrs. Barbour ask him if it was because this woman was a "nigger" that "he hung her," to which Burns replied, "Yes, sir."

Marie Barbour testified that she first saw Burns to know him on February 5, 1949; that Clifford Burns came over to the table where witness, John McLaughlin, and Parker Simpson were sitting, put his hands on the table and said, "Yes, I was on that trial, he says, 'What of it'"; that Burns looked like he was mad, and that she did not want to argue with him; that Burns then said, "Yes, if I had my way about it, I would kill all of the G—damn niggers." This witness testified that she told Burns, "You feel that way, they got a soul," to which he replied, "You mean to tell me a nigger is as good as I am?", and then witness testified that she said, "I didn't exactly say that, I feel sorry for you. They got a soul."; and witness testified that Burns then said, "I don't think so, if I had my way I would kill them all; they all ought to be dead, these prisons are running over and they don't have any room for them, just kill them all." When the witness asked Burns, "You mean to tell me you want to see that woman put to death because she is a nigger," he answered, "Yes, ma'am."

On cross-examination Mrs. Barbour testified that Burns on that occasion said, "I would like to see all these niggers dead,"; that he said, "They are no good," and when the witness told Burns, "You mean to tell me that? I feel sorry for you," Burns said, "All the G— damn niggers ought to be dead."

In *Watkins* v. *The Baltimore and Ohio Railway Co.*, 130 W. Va. 268, syl., 43 S. E. 2d 219, 220, this Court held: "A motion to set aside a verdict and grant a new trial on the ground that a juror subject to challenge for cause was a member of the jury which returned it, must be supported

by proof that the juror was disqualified, that movant was diligent in his efforts to ascertain the disqualification, and that prejudice or injustice resulted from the fact that said juror participated in finding and returning the verdict. Such facts must be established by proof submitted to the court in support of the motion, and not from evidence adduced before the jury upon the trial." In *Wagoner* v. *Iaeger*, 49 W. Va. 61, pt. 1 syl., 38 S. E. 528, this Court held that "The verdict of a jury will not be set aside because of grounds of challenge against a juror, which might have been known to the challenger or his counsel by the exercise of ordinary diligence; a failure to exercise such ordinary diligence being deemed equivalent to a waiver of the cause of challenge." In the concurring opinion by Judge Kenna in the *Watkins* case, it is noted that neither the court nor the attorney for plaintiff on voir dire in that case asked the panel whether any of its members were employed by the defendant, The Baltimore and Ohio Railroad Company, the alleged ground of disqualification. In the case of *State* v. *Hayes*, 109 W. Va. 296, pt. 1 syl., 153 S. E. 496, it was held that "Exceptions to a juror, because of alleged prejudice against defendant as shown by his voir dire, come too late after verdict." In that case the juror was asked by counsel for defendant whether "he did not have some prejudice against the prisoner who had previously been tried for the murder of one McLaughlin and was answered that he [the juror] could not say he did not have such prejudice." In answer to another question he stated that "The things he had heard about the prisoner in connection with the McLaughlin murder might have created in his mind a fixed opinion against his reputation." On further examination, however, the prospective juror testified that he would be governed solely by the evidence. This prospective juror, while he was accepted as a member of the panel of twenty, was not a member of the petit jury which rendered the verdict. There was no motion to strike this juror from the panel, and he was not challenged. In *Hunter* v. *Matthews*, 12 Leigh, 39 Va. 228, 237, it was held that: "The right of challenge, where it exists, must be exercised before the

jury shall be sworn, and if not so exercised, the objection is unavailing to set aside the verdict." Generally, it is the law that the challenge of a venireman that he is not qualified, according to law, comes too late after he is sworn to try the issue. *Thompson* v. *Commonwealth,* 8 Gratt. (49 Va.) 637; *Ohio River Railway Co.,* v. *Blake, supra.*

However, the Judge of the Circuit Court of Logan County exercised proper care in looking to the qualification of the jurors in the instant case. He specifically asked the panel from which the jury was selected whether they had any bias in favor of or prejudice against members of the negro race, and they, including the juror, Clifford Burns, answered in the negative. No further duty rested upon the court; and, because Burns' answer was in the negative, counsel for the defendant had reason to believe that he was qualified as a juror. There was nothing during the course of the trial to indicate, either to the court or to counsel for defendant, that the juror was, in fact, disqualified. In these circumstances, it was not the duty of counsel to challenge this juror. This Court has noted the care, ability and discernment which the Circuit Court of Logan County exercised in the trial of this case. We have noted, so far as this record discloses, that there has been no lack of diligence on the part of counsel for the defendant. We are impressed with the fact that every reasonable effort during the course of this trial was made by the court, as well as the prosecuting attorney and counsel for defendant, to give this young woman a fair and impartial trial; but in a case like this where the question of premeditation, deliberation and malice, which are necessary in order to permit the infliction of capital punishment, is as close as is indicated by this record, all dependence must rest upon the integrity and freedom from bias of the jury. If a single member of that jury, notwithstanding the care of the trial court and the diligence of defendant's counsel, entertained such prejudice that he would be mentally unable to give defendant a fair trial, this defendant was not tried by twelve impartial jurors,

who, from ancient times under our common law system of justice, which in these times is typically American, is the protection of every citizen charged with crime, whether he be guilty or not.

In the administration of justice, free from racial hatred, the way has been tortuous indeed. But on the rare occasions that racial hatred has invaded and reared its venomous head in the halls of justice in this country, the Courts, at least in these modern times, have invoked the due process clauses of the Federal and State Constitutions and have met the issue squarely and justly.

In the early history of this State, Taylor Strauder was indicted for murder in the Circuit Court of Ohio County on October 20, 1874, and convicted and sentenced. At that time the statute of the State of West Virginia, Acts of the Legislature, 1872-1873, page 102, notwithstanding the provisions of the Fourteenth Amendment to the Constitution of the United States, provided that: "All white male persons who are twenty-one years of age, and who are citizens of this State shall be liable to serve as jurors, except as herein provided." The persons excepted at that time were State officials. Section 641 of the Revised Statutes of the United States then provided that "When any civil suit or criminal prosecution is commenced in any State Court, for any cause whatsoever, against any person who is denied or cannot enforce in the judicial tribunals of the State, or in the part of the State where such suit or prosecution is pending, any right secured to him by any law providing for equal civil rights of citizens of the United States, * * * such suit or prosecution may, upon the petition of such defendant, filed in said State Court at any time before the trial or final hearing of the cause, stating the facts and verified by oath, be removed for trial into the next circuit court to be held in the district where it is pending." In that case the defendant filed a petition in the Circuit Court of Ohio County before trial asking that the case be removed to the United States Circuit Court. This application for removal was denied by the Circuit Court of Ohio County, and the defendant was convicted

of murder and sentenced. Upon writ of error to this Court, the judgment of sentence of the Circuit Court of Ohio County was affirmed. Error having been prosecuted to the Supreme Court of the United States, that Court in the case of *Strauder* v. *State of West Virginia,* 100 U. S. 303, 25 L. Ed. 664, Mr. Justice Strong, writing an able opinion, held that Section 641 of the Revised Statutes of the United States was not in conflict with the Constitution of the United States; that the Act of the Legislature contained in Acts of the Legislature, 1872-1873, page 102, confining the personnel of juries to white male citizens who are twenty-one years of age and citizens of the State, was unconstitutional, as being in derogation of the Fourteenth Amendment to the Constitution of the United States. In point three of the syllabus in the *Strauder* case, written by the writer of the majority opinion in that case, the Court said: "The words of the amendment [the Fourteenth Amendment to the United States Constitution], although prohibitory, contain a necessary implication of a positive immunity, or right, most valuable to the colored race—the right to exemption from unfriendly legislation against them distinctively as colored—exemption from discriminations, imposed by public authority, implying legal inferiority in civil society, lessening the security of their rights, and which are steps towards reducing them to the condition of a subject race."

Since the *Strauder* case, many cases through the course of years, have come before the Supreme Court of the United States, involving jury trials in criminal cases, where members of the negro race were involved; and time and time again it has been demonstrated that the Constitution of the United States, especially the Fourteenth Amendment thereto, stands as a bulwark against discrimination, either in the personnel of juries, or the failure to appoint counsel, when members of the negro race have been brought to trial in criminal cases in state courts.

In the leading case of *Powell* v. *Alabama,* 287 U. S. 45, 53 S. Ct. 55, 77 L. ed. 158, a case wherein negroes were

charged and convicted of rape, having been seized by a sheriff's posse and the trial conducted under a military guard in an atmosphere of hostility, with mob rule standing in the offing, the Supreme Court of the United States, Judge Sutherland writing an able opinion, by a vote of almost the full court held that in a *capital case,* where the defendant is unable to employ counsel and is incapable of making his own defense adequately, because of ignorance, feeble-mindedness, illiteracy, or the like, it is the duty of the Court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law. The Court further held that that duty is not discharged by the assignment of counsel at such time and in such circumstances as to preclude the giving of effective aid in the preparation and trial of the case. See also *Pierre* v. *State of Louisiana,* 306 U. S. 354, 59 S. Ct. 536, 83 L. Ed. 757. Those cases, unlike the instant case, involved the actions of trial courts.

Though this case involves no dereliction of duty on the part of the able Judge of the Circuit Court of Logan County, it does, however, concern the very life of a twenty-three-year old woman, in which the evidence on the question of premeditation, deliberation, and malice conflicts greatly. It is typically the kind of case where a defendant should have a jury whose integrity and freedom from bias are beyond reproach. Three comparatively disinterested witnesses testified concerning juror Burns' mental attitude toward the defendant. Whether these witnesses told the truth on the inquiry growing out of the motion to set aside the verdict, or whether juror Burns answered truthfully on his voir dire is not for this Court to say, for we cannot fathom the workings of the human mind. But because this young defendant was convicted of a capital offense and sentenced to be hanged in this case, in which her constitutional rights are involved, we dare not hazard a guess. If the killing of decedent by the defendant was premeditated and malicious, she is guilty of the crime for which she was convicted, and should pay her debt to society like all other persons guilty of the revolting crime of murder. If she is guilty, as charged in

the indictment, she has violated one of the Great Commandments, and, by the same token, she has violated the criminal law of this State. But her guilt or innocence is not dependent upon whether she is white or black, for after all is said and done she is a citizen of this State, and is entitled to the protection afforded by the Fourteenth Amendment to the Constitution of the United States and the due process clause of the Constitution of this State, contained in Article III, Section 10.

The instant case is to be distinguished from *State* v. *Preece*, 116 W. Va. 176, 179 S. E. 524, in which this Court held that it was not reversible error for the trial court to refuse to set aside the verdict on account of affidavits filed by the defendant setting forth statements showing prejudice to the defendant made prior to the trial by a member of the jury, *in the absence of a showing that the accused suffered prejudice by reason of the fact that the juror served.*

Confining our decision to the facts of this case and to verdicts making mandatory capital punishment, and being well aware that verdicts rendered by impartial juries in criminal cases must not be haphazardly imperiled, we, in the interests of justice, reverse the judgment of the Circuit Court of Logan County, set aside the verdict, and award the defendant a new trial.

> *Judgment reversed;*
> *verdict set aside;*
> *new trial awarded.*