79 S.E.2d 87 (1953)
McCABE
v.
CITY OF PARKERSBURG.
No. 10542.
Supreme Court of Appeals of West Virginia.
Submitted September 8, 1953.
Decided November 3, 1953.
Dissenting Opinion December 14, 1953.
*89 Handlan, Overton & Earley, J. M. Handlan, Boreman & Stealey, R. E. Stealey, Parkersburg, for plaintiff in error.
McCluer, Davis & McDougle, James S. McCluer, Pennybacker & Crofton, Walter T. Crofton, Jr., Parkersburg, for defendant in error.
*88 BROWNING, Judge.
Emilie McCabe instituted this action of trespass on the case in October, 1949 against the City of Parkersburg seeking to recover damages for the undermining and sloughing away of her lot and the settling *90 of her dwelling house, allegedly the result of the city's collection of large quantities of rain and surface waters through its sewerage system, and wrongfully casting such waters upon her property and adjacent property.
The plaintiff is the owner of a lot 42' by 100' on which there is a two story brick dwelling house known as No. 23 Park Place in the City of Parkersburg. The land was originally filled in 1900, with perhaps an additional fill in 1909 or 1910, bringing the land to its present level and making the depth of the fill 20' or more. The house was constructed thereon in 1912. At the rear of the house was a yard, approximately 30' deep, ending in a fairly steep embankment, the northwest corner of which looked down upon Pond Run. The City of Parkersburg maintains a 24" storm sewer approximately 6' to the rear and parallel with the rear line of plaintiff's lot, and 12' below the level of plaintiff's land. At one time this sewer had a headwall and was probably completely covered by a portion of the fill.
The evidence shows that at the time of the trial the headwall of this sewer had disappeared and the tiles had been broken back a distance of about 20'. The northwest corner of plaintiff's lot, comprising approximately one-half of the backyard area, had slipped or sloughed away, and the west wall of plaintiff's house had settled approximately 4" causing several cracks in the cellar and on the exterior of the house.
Plaintiff testified that she first noticed a sloughing out of the bottom of the fill in 1944, and complained to the city at that time. Later, in 1948, the northwestern portion of her lot was being eaten away, the sewer had broken farther back, and cracks had begun to appear in her house. She offered the testimony of a professional engineer who, after an examination of the property, formed the opinion that the chain of events was a breaking up of the sewer, undermining of the plaintiff's lot, the slippage, and the consequent settlement of plaintiff's dwelling house. She also offered the testimony of realtors who had examined the property in 1951 that it was then worth $6,000, and would have been worth $12,000 without the visible damage at the time they viewed the premises.
In defense of the action, the city offered the evidence of engineers and architects who had made personal examinations of the property, tested the downspouts, and made borings of the soil on adjacent property close to plaintiff's property line. Basing their opinions upon the results of these tests, they came to the conclusion that the settling of the house could not have resulted from the discharge of the sewer; that the house still had more than adequate lateral support; and that the probable cause of the settlement was a percolation of water from a broken downspout around the footers, a settlement of the fill as a result of flood waters, the evidence showing that the Ohio River had reached a stage of 25', or sufficient to raise the water 4' above the opening of the sewer, and 8' below the level of plaintiff's land, a total of 493 times between the year 1913 and the institution of this action, or a settlement of the fill, possibly, but improbably, due to an instable muck found at a depth of 22' under plaintiff's land.
The jury returned a verdict in favor of the plaintiff in the amount of $4,000, and judgment was entered thereon, to which this Court granted a writ of error on December 22, 1952.
The principal errors relied upon for reversal by the city are: (1) Instructing the jury as to the liability of the city upon the evidence adduced; (2) the admission of certain evidence as to damages to the plaintiff's property; (3) admitting testimony and instructing the jury upon the theory that the damage to plaintiff's property was permanent rather than temporary; and (4) the verdict is not supported by the evidence.
The plaintiff's declaration contains two counts, the first charging the city with collecting "by means of certain sewers, catch-basins and drains, large quantities of rain and surface waters, which it wrongfully cast upon the property of the plaintiff and the property immediately adjacent *91 thereto with the intent of injuring and aggrieving the plaintiff in the possession and enjoyment of her said property and of damaging the same to the extent that it would no longer be fit for the purpose for which it was constructed to-wit, as a dwelling house for the plaintiff, or others renting from her to live in and for the use and enjoyment of the lot of land upon which said dwelling house was located. That the wrongs so committed have been of a continuing nature and have resulted in destroying the lateral support of plaintiff's land and in undermining a portion of the lot belonging to the plaintiff and of causing the dwelling house thereon to settle, * * *." The second count charges that the city "collected divers large quantities of surface waters, which previously had been accustomed to flow in other directions and has cast the same upon the premises of the plaintiff and upon the lands immediately adjacent thereto in such a careless, negligent, wrongful and improper manner that by reason thereof the lateral support of plaintiff's lot was destroyed and a large portion of it washed away, and the dwelling house upon the property belonging to the plaintiff became, and was, and is greatly damaged, * * *."
Upon these allegations in the declaration, and the testimony of the plaintiff as to the sloughing or washing away of the lot and the damage to the dwelling house by subsidence, the court gave to the jury, over objection of the defendant, Plaintiff's Instruction No. 1 which is as follows:
"The jury is instructed that it is the duty of a municipality in disposing of the surface waters that fall upon its streets and alleys by means of storm sewers, to keep and maintain said sewers in such condition and repair as not to permit the waters passing through them to escape and do damage to the property of others, and if you believe that the defendant, The City of Parkersburg, failed to repair damage done to one of its storm sewers with the result that the waters passing through the same were cast upon the property of the plaintiff or upon property adjacent thereto in such a manner as to damage the property of the plaintiff, then the plaintiff is entitled to recover from the defendant the amount of such damage."
We believe it to be well established in this jurisdiction and elsewhere that the owner of land is entitled, ex jure naturae, to the lateral support in the adjacent land for his soil, but not for buildings erected thereon. The city, therefore, would have been liable to the plaintiff for the removal of the lateral support of her ground and causing it, unburdened by the building which was situate upon it, to fall, slide or break away, regardless of whether the city was guilty of negligence. It is just as well established that the owner of a building has no right of support from the land of adjacent owners, and that any recovery in this case by the plaintiff against the city for damage to the dwelling house must necessarily have been based upon negligent acts of the city. Peddicord v. County Court, 121 W.Va. 270, 3 S.E.2d 222; Walker v. Strosnider, 67 W.Va. 39, 67 S.E. 1087.
A municipality in the maintenance of its sewerage system, in the absence of statute, owes only a duty of reasonable care, there being in this State no statute imposing absolute liability as in the case of the maintenance by a municipality of its streets and sidewalks. However, it is the duty of a city from the time it acquires or constructs a sewer to maintain it in a reasonably safe condition. This Court held in Clay v. City of St. Albans, 43 W.Va. 539, 27 S.E. 368, that if a city or town collects surface water and casts it in a body on land, it is liable in damages. It was therein held that municipal corporations "may or may not, as they choose, exercise this power in any street, as the right to elect to do so or not to do so is a matter of discretion, quasi judicial; but when once the corporation decides to do so, and constructs sewers or drains and gutters, the duty has become merely ministerial, and the town bound to keep them in fairly good condition to carry off the water ordinarily and naturally coming into the gutter or sewer in the *92 section where the town is, so as not to overflow lot owners. * * *" "* * * a city is liable for an injury to the plaintiff resulting from flooding his premises with water, where such injury is caused by the neglect of the city to keep the sewer in proper repair." 6 N.J., Drains, Sewers and Drainage Districts, § 6. Chalkley v. City of Richmond, 88 Va. 402, 14 S.E. 339.
If the plaintiff, under the allegations of count number 1 in her declaration, was relying upon her absolute right to lateral support for her soil, under the doctrine of the Peddicord and Strosnider cases, the jury should have been informed that this absolute liability did not extend to the buildings erected thereon. If the allegations of the first count of the plaintiff's declaration were based upon a theory of absolute liability on the part of the city to maintain its sewerage system so that damage would not result to a property owner, even in the absence of negligence on the part of the city, such is not the law in this jurisdiction. If Plaintiff's Instruction No. 1 was offered upon the theory that the city was negligent in the maintenance of its sewerage system, causing the damage to plaintiff's property, under the allegations of the second count of the declaration, it is fatally defective in that it does not so inform the jury, nor does it state that the plaintiff must prove such negligence by a preponderance of the evidence, and show that the city's negligence in that regard was the proximate cause of the damage to plaintiff's property. There must be a relative continuity between the allegations in a declaration, the evidence and the instructions so that a jury may know, or at least be informed, of the specific theory of recovery relied upon by the plaintiff in each count of the declaration. Therefore, the giving of Plaintiff's Instruction No. 1 was reversible error. The same criticism attaches to the giving of Plaintiff's Instruction No. 2.
The second count of the declaration alleges negligence on the part of the city, and there was a conflict of testimony upon that point which the jury has resolved in favor of the plaintiff. However, the allegations of negligence are not that the city permitted one of its sewers to get out of repair and do the damage alleged, but rather the city is charged with collecting and casting large quantities of surface water upon the land of the plaintiff and upon property adjacent thereto. This Court has held that such conduct on the part of a city is actionable. Jordan v. City of Benwood, 42 W.Va. 312, 26 S.E. 266, 36 L.R.A. 519, and Clay v. City of St. Albans, supra. The evidence in this case shows, however, that no amount of water was cast upon the property of plaintiff, the damage thereto resulting, according to plaintiff's theory of the case as it was developed by the evidence, by a broken sewer discharging water onto an adjacent property owner's land at a point approximately six feet from the plaintiff's property line, removing the soil from the adjacent property and thereby permitting a slippage of plaintiff's lot. All of this occurred at a point at least twelve feet below the level of plaintiff's land on which her house is situate, and, as heretofore stated, six feet from her property line. We do not say that such negligent conduct on the part of the city is not actionable, but the proof offered should not be at variance with the allegations in the declaration.
Though the judgment of the trial court must be reversed upon the grounds heretofore stated, we are of the opinion that a discussion of other assignments of error may be helpful, inasmuch as the case must be remanded for a new trial.
C. R. Tustin and E. Paul Flinn, relators of the City of Parkersburg, testified that the value of plaintiff's property in June, 1951, more than two years after the institution of this action, was $6,000, and that it would at that time have been worth $12,000 "without the existing damage". The court properly instructed the jury upon the assumption that the damages were permanent and not temporary; that they should consider the reasonable market value of the property before the alleged slippage and its reasonable market value thereafter *93 in assessing the plaintiff's damages; but the testimony of the two witnesses last referred to did not meet that requirement. Furthermore, the court admitted in evidence a letter addressed to the plaintiff on the letterhead of the "Parkersburg Board of Realtors", signed by the two witnesses above mentioned, and one W. C. Nohe, who apparently had been appointed by the board of realtors as an appraisal committee, at the request of the plaintiff, to examine her property and assess damages to it. Mr. Nohe, one of the persons signing the appraisal letter, did not testify as a witness. As to him, the report, of course, was purely hearsay and inadmissible, and it was inadmissible also for any purpose, inasmuch as Tustin and Flinn having appeared as witnesses, their extra judicial declarations were not admissible to corroborate or bolster their testimony, since neither had been impeached. State v. Dean, 134 W.Va. 257, 58 S.E.2d 860.
It is not denied that the damage to plaintiff's property, if caused by the negligent action of the city, was intermittent and gradual, resulting from the forceful ejection of water from one of its storm sewers, which occurred only after substantial rain had fallen upon that part of the city which was drained by this sewer, and at intervals over a long period of time. This Court held in McHenry v. City of Parkersburg, Syl. Pt. 1, 66 W.Va. 533, 66 S.E. 750, 29 L.R.A., N.S., 860 that: "Injury to real property, caused by a city, in the collection of surface water and casting the same upon the premises, by means of the grading and sewering of its streets, so as to subject the same to occasional and intermittent submergence, gives right to recovery of temporary, not permanent, damages." To the same effect upon the question of temporary or permanent damages are Oresta v. Romano Bros., Inc., W.Va., 73 S.E.2d 622; Riddle v. Baltimore & Ohio R. Co., W.Va., 73 S.E.2d 793; Jones v. Pennsylvania Railroad, W.Va., 75 S.E.2d 103, 105. In the Pennsylvania Railroad case, this Court, quoting from Watts v. Norfolk & W. R. Co., 39 W.Va. 196, 19 S.E. 521, 23 L.R.A. 674, said: "Where the cause of injury is in its nature permanent, and a recovery for such injury would confer a license on the defendant to continue it, the entire damages may be recovered in a single action; but where the cause of injury is in the nature of a nuisance, and not permanent in character, but such that it may be supposed that the defendant would remove it rather than suffer at once entire damages, which it might inflict if permanent, then the entire damages, so as to include future damages, can not be recovered in a single action, but actions may be maintained from time to time so long as the cause of the injury continues."
In 14 M.J., Nuisances, § 43, we find these statements which have been approved by prior decisions of this Court: "* * * Permanent damages cannot be recovered for the maintenance of a removable nuisance, but actual damages may be recovered for its maintenance up to the time of judgment. * * *" "* * * In all cases of doubt respecting the permanency of the injury inflicted by a nuisance, the courts are inclined to favor the right to bring successive actions."
Under the circumstances of this case, the plaintiff, therefore, could only be entitled to the recovery of temporary damages, the proper measure of which is cost of repairs, compensation for loss of use or rent, and reimbursement for actual expenses occasioned thereby.
Upon the question of whether or not the verdict is supported by the evidence, we believe that a rather anomalous situation is presented by this record. Mr. Vincent F. Buell, a qualified engineer, testifying in plaintiff's behalf, unequivocally stated that the washing away of the land immediately adjacent to the rear of plaintiff's lot caused her land to slip away, causing the slough about which she complains. The defendant's witness Merrill, also a civil engineer, does not specifically disagree with that contention. The lay testimony, together with the photographs of the area introduced in evidence, and the view of the premises, would have justified the jury in returning a verdict upon proper pleadings and instructions *94 that the damage to the rear portion of the lot of plaintiff was due to the negligence of the city in not properly maintaining in repair its sewer. However, we are of the opinion that the preponderance of the evidence as to the damage to the house itself is clearly in favor of the defendant. Mr. Robert F. Baker, a civil engineer and soils expert, Mr. Merrill and other expert witnesses made exhaustive tests of the soil, the amount of weight per lineal foot that was necessary to support the house, and the amount per lineal foot which it was receiving as support, and all testified unequivocally that no lateral support has been removed from the house as a result of the slough, and, therefore, that any cracking or any damage that has resulted to the structure itself is from some cause other than the falling away of the soil to the rear of the lot. They explain the subsidence of the house by stating that it is either due to the percolation of water from the broken spouts around the footers, a settlement of the fill or the instaple muck upon which the fill was made in constructing plaintiff's lot, as heretofore stated.
It is true that the plaintiff's witness Buell testified to the contrary regarding the damage to the house, but an examination of his testimony reveals that he made no tests whatever upon which to base his testimony, and that he often used such phrases as "assuming from experience", "conceivably", and "could very conceivably", in explaining his conclusions. The trial court ruled that this witness had not made sufficient investigation as to the damage to the house to give an opinion thereon, and we cannot say that it was in error in so ruling.
Furthermore, the indisputable evidence, as revealed by the testimony of witnesses, as well as the photographs introduced as exhibits, showed that the principal damage to plaintiff's dwelling house occurred not to that portion of the house closest to the slough, but to points farther removed therefrom, the wall along the street in front of the house, approximately fifty feet from the sloughing, suffering considerable damage. The physical facts, therefore, would seem to be on the side of the defendant's witnesses, and be an added reason for our holding that the plaintiff failed to prove by preponderance of the evidence that the damage to the house itself was due to the falling away of the rear portion of the lot.
While the plaintiff offered testimony to the effect that approximately 225 yards of the soil of the rear portion of her lot had slipped away, allegedly due to the wrongful acts of the defendant, and that the cost of replacement would be $1,100, the verdict of the jury in the sum of $4,000 shows conclusively that it considered the damage to the house as well as the lot in arriving at its verdict. "A verdict clearly in excess of the amount which the evidence shows the plaintiff is justly entitled to recover should be set aside by the trial court." Syl. Pt. 2, Thomason v. Mosrie, 134 W.Va. 634, 60 S.E.2d 699, 701.
The judgment of the Circuit Court of Wood County is reversed, the verdict of the jury set aside, and the case is remanded for a new trial.
Reversed and remanded.
LOVINS, Judge (dissenting).
I concur in the reversal of this case, but I do not concur in all of the reasoning set forth in the Court's opinion.
The opinion approaches the question on the basis that the land of the plaintiff and the building erected thereon are separate entities. I do not think that such is the proper approach.
It is an ancient rule that houses and other buildings erected upon land are considered as land under the doctrine of accession. "It legally includeth also castles, houses, and other buildings: for castles, houses, &c. consist upon two things, viz. land or ground, as the foundation or structure thereupon; so as passing the land or ground, the structure or building thereupon passeth therewith." 1 Coke Upon Littleton, Thomas, Book II, Chapter 1. *95 "So that the word `land' includes not only the face of the earth, but every thing under it, or over it." Volume 1, Chitty's Blackstone, star page 19. "All real property or things real, are said to be comprehended under the terms, lands, tenements, and hereditaments. Land is the soil of the earth, and includes everything erected upon its surface, or which is buried beneath it." Tiedeman on Real Property, Third Edition, Part 1, Section 2. See Sharswood, Blackstone's Commentaries, Book II, Chapter 11, page 16; Williams on Real Property, 22nd Edition, page 34; 1 Washburn on Real Property, Sixth Edition, Chapter 1, Section 2; Notes on Real Property, Graves, page 16.
We have authority on that subject in our own jurisdiction. Fruth v. Board of Affairs, 75 W.Va. 456, 460, 84 S.E. 105, L.R.A.1915C, 981; Jones v. Shufflin, 45 W.Va. 729, 731, 31 S.E. 975. Lastly, a statute which reads as follows: "The word `land' or `lands' and the words `real estate' or `real property' include lands, tenements and hereditaments, and all rights thereto and interests therein except chattel interests". Code, 2-2-10, Sub-paragraph (p).
Starting from the premise that land and the buildings thereon constitute a single entity, as shown by the preceding paragraph, I think that there could be no separation of the dwelling house located on the McCabe lot and the land on which it was located. It will be noted that the Court's opinion cites no authority for treating the building and the land as separate elements. It is only fair to say that neither have I been able to find any authority explicitly discussing that question, the probable reason for lack of authority being that such treatment has never been accorded the subject in an opinion of a court of last resort.
There are certain guide posts however, which are found in the cases hereinafter cited, which disclose that the instant case is such a rare instance where lands are treated as being separate from the buildings located thereon. Where there has been total destruction of a building or other structure by fire, water, tornado, windstorm or other casualty, leaving the bare land, the value of the destroyed property may be so treated. But in the instant case, there was damage to the land on which the dwelling house was located. The dwelling house in its damaged condition remains on the land. Of course, it is a question of proof whether the damage to the land caused the damage to the building. That is a question of fact which was resolved by the jury in favor of the plaintiff and it is proper to say at this point that the connection between the damages to the dwelling house and the breaking and slipping of the land is not so well established.
Adverting again to the guide posts in the solution of the question here presented. The recent case of Winnings v. Wilpen Coal Co., 134 W.Va. 387, 59 S.E.2d pages 655, 662, damages to a house caused by a subsidence of the surface of the land, as well as damages to the land, were treated together. See Prestonsburg Superior Oil Gas Co. v. Vance, 215 Ky. 77, 284 S.W. 405, 406, 47 A.L.R. 483, wherein a house was destroyed by fire. The fifth headnote reads as follows: "Measure of damages for destruction of building by fire is not market value of building, which has no such value apart from ground on which it stands, but its fair and reasonable value when and where destroyed." (Emphasis supplied.)
It is necessary to say here that I do not disagree with the measure of damages laid down in the Court's opinion in the instant case, but it will be noted in the above quoted headnote that the Court held in the Prestonsburg Superior Oil Gas Co. v. Vance, supra, that the building had no market value apart from the ground on which it stood. "It has been held that such value is not the market value of the building, because a building apart from the ground on which it stands cannot be said to have a market value." 15 Am.Jur., Damages, Section 112, et seq. See Jacksonville, T. & K. W. Ry. Co. v. Peninsular Land, Transp. & Mfg. Co., 27 Fla. 1, 157, 9 So. 661, 689, 17 L.R.A. 33, 65; McMahon v. City of Dubuque, 107 Iowa 62, 77 N.W. 517; Prestonsburg Superior Oil Gas Co. v. Vance, supra; Sutherland *96 Damages, Fourth Edition, Sections 1015 and 1053.
Of course, if the building is to be separated from the land and removed from the land, it may be treated as personal property. 73 C.J.S., Property, § 11, et seq. But here, there is neither separation, contemplated separation, nor removal of the building from the land on which it is situated. In the instant case, the dwelling house, in its damaged condition, is a part of realty and cannot be separated therefrom, nor has it been destroyed. See Givens v. Markall, 51 Cal.App.2d 374, 124 P.2d 839.
A summation of my view on this case is: I have some doubts about the first point of the syllabus; I agree with the second, third, fourth, fifth, sixth and part of the seventh point of the syllabus. I do not think however, that the items of damages are "severable", in the facts disclosed by the record of this case. I think that the judgment of the lower court was properly reversed, but I do not agree with the reasoning as herein noted, hence, this criticism.