STATE OF WEST VIRGINIA *v.* H. W. PREECE

(No. 8010)

Submitted February 26, 1935. Decided March 12, 1935.

*W. H. D. Preece* and *Frank Lively,* for plaintiff in error.

*Homer A. Holt,* Attorney General, and *Kenneth E. Hines,* Assistant Attorney General, for the State.

KENNA, JUDGE:

H. W. Preece was convicted in the circuit court of Mingo County of voluntary manslaughter for the killing of W. K. Fine at Williamson on February 10, 1934. To the judgment of the court sentencing him to five years' imprisonment in the penitentiary, he prosecutes this writ of error.

Self-defense in the protection of his home was relied upon by the defendant, and, since the assignments of error are in the main based upon the state of the proof, it will be necessary to give the evidence in some detail.

The deceased, W. K. Fine, was a man of medium height, weighing about 150 pounds and 49 years of age. He was employed as a hostler foreman in the yards of the Norfolk & Western Railway at Williamson. A little after seven o'clock on the morning of February 10, 1934, having concluded his night shift, he left his place of employment in company with W. R. Wolford, age 22, who had that day been promoted from

the position of messenger to that of machinist apprentice in the railroad yards. They went from the railroad yards to the east end of Williamson, which is about a mile from where the defendant lived, and there they bought a "short pint" of whiskey, the bottle containing ten or twelve ounces. This they drank, and afterward went to where Wolford resided with his married sister on Reservation Hill and stayed there fifteen or twenty minutes. Fine started home. Deciding that they wanted another drink, they went to a place on Fourth Avenue and got a half pint more whiskey and drank that. On leaving the Fourth Avenue place, Fine decided that he wanted to see Bill Ferguson. Wolford knew that Ferguson lived with Preece, and they went to the Preece apartment on Fifth Avenue.

There are no sketches of this building, either of the floor plan or of the outside elevation, in the record, and the descriptions of it by the witnesses are by no means clear, due in part to the fact that they frequently illustrated relative positions in ways that the transcript fails to make clear. However, it was a two-story building facing Fifth Avenue. It contained four apartments, two downstairs and two upstairs. There was a porch across the downstairs front, and at the middle of the building there were twin stairways extending from a hallway eight or ten feet deep to the second floor. These stairways were separated by a partition and were approximately three feet wide. It does not appear whether the partition separated the hallways at the bottom of the stairs or not, although there was a railing that divided the outside porch in the same manner that the stairway was divided by the partition on the inside. N. A. Smith occupied the apartment on the right downstairs. Mrs. Frank Sloan occupied the downstairs apartment on the left. Preece occupied the five-room apartment on the left upstairs, and Bill Ferguson rented a room in the apartment on the right upstairs, but spent most of his time in the Preece apartment, where he often slept. The two upstairs apartments were connected by a back hall, where there was a door through the partition. There was a hallway or landing at the head of the stairs on each side of the partition from which each upstairs apartment was entered. The up-

stairs apartment rooms open onto a hallway, and the door of Preece's bedroom was approximately eight feet from this landing. The arrangement of rooms does not satisfactorily appear, nor does the location of the hallway. There was no back stairway to Preece's apartment, although there probably was to the apartment upstairs on the right.

When Fine and Wolford, shortly after nine o'clock, got to this building, they went to the Smith apartment on the right downstairs and asked for Bill Ferguson. They were told by Mrs. Smith that he was upstairs in the Preece apartment. They stepped over the railing on the porch and went upstairs to look for Preece. On the upstairs landing, they encountered Preece, and had some words with him that caused Ferguson to come out on to the landing and join in persuading Fine to leave. Wolford and Ferguson took Fine downstairs, but when he got to the downstairs hallway, he broke away from them, made his way up the stairway and was there shot by Preece, dying within five minutes. The stairway was dimly lighted, but, besides the deceased, there were two persons present at the bottom of the stairway, Wolford and Ferguson, and two at the top, Preece and Jim Cole, a colored man seventy-two years of age, who was there doing some cleaning for Preece. Preece is 63 years of age and although his height and weight do not appear in the record, it is testified that he was a considerably larger man than Fine. It is upon the testimony of these witnesses, Wolford, Ferguson, Cole and Preece that the actual circumstances and conditions surrounding the shooting must be determined. It is therefore necessary to give their testimony in some detail.

Wolford states that he and Fine went upstairs and that at the top of the stairs, they encountered Preece. He says that they told Preece they were looking for Bill Ferguson, and that Preece told them they were both drunk and to get out, stating that Bill Ferguson had worked all night and was in bed. He says that thereupon Fine shook his finger in Preece's face and stated that they did not come there for any trouble; that then Preece gave Fine a push, telling him that Bill Ferguson was in bed and for him to go out. He says that when Preece shoved Fine, Fine swore at him and called him a bad

name. He states that then Ferguson and he managed to get Fine to the bottom of the stairs, and that Preece was at that time leaning over the banister, shouting for them to get out and that they had no business there. He says that Fine got mad and broke loose from them and started back up the stairs and that he started after him. He states that Ferguson grabbed him and that he heard Fine say that he was going back up and "whip that old (vile epithet)." He states that he was not looking in the direction of Fine and Preece when the shot was fired, but that immediately after the shot was fired, he looked up and saw Preece leaning over the banister with the gun in his hand and just taking it back from over the banister. He saw Fine fall and went out to a nearby lunch stand and called the police. He says that as Fine started up the stairs he had his overcoat on, but that afterwards, when he returned to the scene of the shooting about five minutes later, he saw the overcoat about half way up the stairs. When he got back to the scene of the shooting, he went upstairs and was under the impression that Bill Ferguson was the man lying on the floor. He got back just about the time that Fine died.

Bill Ferguson testified that he knew both Fine and Wolford and was on friendly terms with Preece. He had returned from work that morning and was in the sitting room of Preece's apartment. He had not removed his clothes nor had he gone to bed. He heard someone cursing out at the head of the stairs and when he went out, "these fellows" were out there, and Preece was telling them to go on down the stairs, that he didn't want to have any trouble with them. Ferguson walked in between Preece and the two other men and took "them" by the arm. Preece shoved Fine and told him to go on down, that he didn't want to have any trouble with them. Ferguson said, "Go on down and I will go with you." They started down the stairs and started to go out. The front door seemed to be fastened someway. Fine jerked loose from him, wheeled around, jerked his overcoat off and took back upstairs, swearing and saying, "I am going to go back and kill the damn (vile epithet)." He didn't watch Fine go up the stairs any further, because he was talking with Wolford

and trying to keep him from going back. He did not notice what Fine did as he went back up the stairway, but knows of nothing that Preece did showing an intention to hurt Fine before he started back up the stairway. He says that both Wolford and Fine acted as though they were drunk, and that Wolford was still drunk after the shooting. When he went back upstairs after the shooting, he found Fine lying near the top of the steps on the floor in the hall with his legs doubled up under him.

Jim Cole testified that he was in the far hall in Preece's apartment, and that he heard someone cursing and going on at the top of the stairs; that he opened the hall door and stepped out and saw Mr. Preece standing there with his left hand on the banister; that he heard someone downstairs in the hall saying, ''(Blasphemous language) you, I will beat hell out of you.'' He asked Preece who that was, and was told that he didn't know; that Preece wanted them to get out of there; that he was trying to get them out and didn't want any trouble there. He states that Preece's door at that time was shut. He says the man said: ''You (blasphemous epithet), I ain't going nowhere. I'll beat hell out of you.'' That he threw off his overcoat down at the bottom of the steps, jerked loose from Bill Ferguson and whirled around and ''struck right up the steps.'' He got about four steps up, slapped his hand behind him and said: ''You (blasphemous epithet), I'll kill you.'' Preece stepped back in his room and got his gun, and said: ''Come on, get him out of here, I don't want no trouble, take him out.'' That he (meaning Fine) stepped right up and Preece was standing there; that he stuck his hand behind him and hit at Preece once, and Preece knocked off the lick; that he hit at him again, and Preece knocked that lick off, and that as the man ''aimed'' to step around Preece, Preece shot him. He says he does not know what occurred before that. About a week after the shooting, Cole says he found a knife in a box kept in the hallway on the landing at the head of the stairs in which meat skins were thrown.

Preece testified that he was in the kitchen of his apartment and heard someone coming up the stairs swearing and stagger-

ing; that he came out and told them that they were awfully drunk, and that he didn't allow anything of that sort around his place, and asked them to leave; that he. didn't know them at all; that upon his asking them to leave, the man who turned out to be Fine told him that he wouldn't go, and, although they were so drunk he hardly knew what they were saying, that they did not inquire for Bill Ferguson. That he had been trying to get them to leave for about five minutes when Bill Ferguson came out, but that he had done nothing toward striking or undertaking to hurt them; that he had no gun at that time; that he told Ferguson to get them away, and that Ferguson took Fine by the arm and dragged him down the stairs, pushing Wolford in front of him. Preece said that he had not been very stout and that he had rheumatism very badly. After Ferguson got them to the bottom of the stairs, Fine tore loose from Ferguson and started back up the stairs saying: "I'll just go back up and kill the (blasphemous epithet)." Up to that time, he had no gun or any intention of shooting anyone; that when Fine started back up the stairs, he believed he was coming back to kill him, and went into his room, a distance of about eight feet, and picked up his gun. He states that when Fine got about two or three steps from the bottom, he told him not to come any further, and that Fine threw his hand behind him, ducking his head, and kept coming on; that as Fine got in reach of him, Fine made a rake at him with his right hand, with his left hand still behind him; that he thought Fine had a gun back there. He knocked off the lick and as Fine made a second lick, he seemed to turn, and that he thought then that Fine was going to shoot, and that as he turned Preece shot.

Fine had no weapon.

The errors assigned are:

(1) That the trial court erred in giving the jury upon its own motion an instruction stating in effect that the defendant was not justified in shooting the deceased in self-defense, unless there was actual necessity therefor.

(2) That the court erred in refusing to set aside the verdict on the ground of after-discovered evidence, evidence misapprehended and misunderstood by the jury, and because one of

the jurors was biased and prejudiced against the defendant. Affidavits in support of the motion on this ground were filed.

(3) That the court erred in refusing to set aside the verdict of the jury and grant the defendant a new trial because of other errors and because the verdict was contrary to the law and the evidence.

We are of the opinion that the assignment of error based upon the trial court's refusal to set aside the verdict on account of the affidavits filed by the defendant setting forth statements showing prejudice to the defendant made prior to the trial by one member of the jury is not well taken. It is not made to appear that accused suffered prejudice by reason of the fact that this juror served. Well settled legal principles preclude this method of attacking a verdict. *State* v. *Murdock*, 90 W. Va. 628, 111 S. E. 632; *State* v. *Porter*, 98 W. Va. 390, 127 S. E. 386. See also, *State* v. *Greer*, 22 W. Va. 800, 820. The affidavits filed in an effort to sustain the motion to set aside the verdict on the ground of after-discovered evidence fall far short of meeting that test. They are to the effect that members of the jury did not understand from the evidence that the stairway approaching the Preece apartment was for the exclusive use of that apartment, but that they gathered the impression that the stairway was for the common use of the Preece apartment and that in which Bill Ferguson had a room. This showing meets none of the well recognized requirements of the rule sought to be invoked.

We are of the opinion that the assignment of error based upon the instructions given by the court on its own motion is well taken. Self-defense is not based upon actual necessity. If there is appreciable evidence from which the jury might reach the conclusion that the defendant believed that he was threatened by the deceased with death or great bodily harm and if the circumstances were such that a reasonably prudent person would be justified in believing, and if the defendant did believe, that the danger of death or great bodily harm from the deceased was actual and imminent, and, not discussing the duty to retreat, that such danger could be averted only by taking the life of the deceased, then the homicide is justifiable and the defense of self-defense is valid. *State* v.

*Thornhill*, 111 W. Va. 258, 161 S. E. 431; *State* v. *Evans*, 33 W. Va. 417, 10 S. E. 792; *State* v. *Cain*, 20 W. Va. 679. Since the instruction is based upon the existence of an *actual* necessity, and ignores the impression that may have existed in the mind of Preece, regardless of the actual fact, it is erroneous. Indeed, it is conceded by the state that the instruction is erroneous. The state argues that the facts themselves do not permit the conclusion that Preece acted in self-defense and therefore that the instruction, although erroneous, is not prejudicial. It is true that he did not give ground, but it must be remembered that he was in his own habitation. While it may be true that many men, rather than to run the risk of killing or of seriously injuring another with a deadly weapon, under any circumstances, would retreat from and even abandon their own home, the settled principles of our law do not require it. The fact that Fine and Wolford were looking for Bill Ferguson, Preece says was not disclosed to him, but even had the jury disregarded that evidence, and had they believed instead the evidence of Wolford to the effect that Preece *was* told that they were looking for Bill Ferguson, that fact would not have justified a violent invasion of Preece's home over his protest, and this he had a right to prevent at the outset and without retreat. If the jury believed that he took his stand *bona fide* for the purpose of preventing such an invasion of his home, then he could stand there, and, if attacked, was there entitled to invoke the law of self-defense, and to kill another if justified on its principles. We do not believe that the circumstance that Preece went to his bed room and there armed himself, returning to the head of the stairway, alters the application of this rule. The law recognizes his right to be armed upon his own premises. Code, 61-7-3.

In this case, Preece stood upon a higher right than one simply defending his person at some place other than in his own home or upon his own premises. He seems not to have been the aggressor, and it is settled law that if he was in his own habitation, he need not retreat from a threatened assault. This is undoubtedly the law in West Virginia. *State* v. *Laura*, 93 W. Va. 250, Pt. 7, Syl., and page 255, 116 S. E. 251. It is

the law in Virginia. *Fortune* v. *Commonwealth*, 133 Va. 669, 686, 112 S. E. 861. It is the law as laid down by the United States Supreme Court. *Beard* v. *U. S.*, (1895) 158 U. S. 550, 559, 15 S. Ct. 962, 39 L. Ed. 1086; *Alberty* v. *U. S.*, (1896) 162 U. S. 499, 505, 16 S. Ct. 864, 40 L. Ed. 1051. It is the general law throughout the United States as the following cases exemplify: *Pennsylvania* v. *Robertson*, (1794) 2 Pa. 246; *Hinton* v. *State*, (1859) 24 Tex. 454; *Mack* v. *State*, (1924) 97 Tex. Crim. Rep. 583, 585, 263 S. W. 912; *State* v. *Dugan*, (1879 Del.) 1 Houston (Crim.) 563; *State* v. *Bartmess*, (1898) 33 Ore. 110, 54 P. 167; *State* v. *Cannon*, (1898) 52 S. C. 452, 30 S. E. 589; *State* v. *Bradley*, (1923) 126 S. C. 528, 533, 120 S. E. 240; *State* v. *Foutch*, (1895) 96 Tenn. 242, 34 S. W. 1; and *Winton* v. *State*, (1925) 151 Tenn. 177, 189, 268 S. W. 633.

In spite of the confusion that exists in the record with reference to a description of the apartment building, there can be but little doubt that from the standpoint of both fact and law, Preece was in his own home. He was in a hallway at the top of a stairway that served only his apartment. At the bottom of the stairway was a door that shut off the stairway from the outside porch. It does not clearly appear whether this door was directly at the bottom of the stair so that it was entered only for the purpose of going to the Preece apartment, or whether it was beyond the stairway and shut off the bottom hallway from the porch, so that it would be used in entering both the downstairs and upstairs apartments on the left. Whatever significance it might have as to the Preece apartment would be the same in either case. Where the facts are not in dispute, the question of whether a man is or is not in his own home is for the court, not for the jury. *State* v. *Laura*, 93 W. Va. 250, Pt. 6, Syl., 116 S. E. 251. Whatever may have been the status of Fine and Wolford when they went to the Preece apartment seeking Ferguson, admitting that the statements of Wolford that they disclosed this purpose to Preece to be true, they certainly became intruders when they were urged by both Preece and Ferguson, the man that they went there to see, to leave.

For the reasons herein given, we believe that error prejudicial to the defendant was committed at his trial, that the

judgment must be reversed, the verdict set aside, and a new trial awarded, to be governed by the principles herein discussed.

Although no objection was made at the time and for that reason the question possibly has no bearing upon this reversal, we cannot overlook a series of interrogatories propounded by the trial judge to the defendant. They are as follows:

"Q. 30. Did you feel it was necessary to take that man's life to stop him?

A. Yes, sir, nothing else to do.

Q. 31. No other way to stop him at that time other than shoot him and kill him?

A. No, sir, I didn't see any other way out of it.

\* \* \* \* \* \* \* \*

Q. 34. He didn't know where your room was, did he?

A. I was in the hall, you know, when he was up there.

Q. 35. I understand, but this man, before you shot, didn't know where your room was, did he?

A. I don't know whether he knew anything about any of it up there or not.

Q. 36. You knew he was drunk?

A. He was drunk but he came up the stairway flying.

Q. 37. He didn't know where your room was, did he?

A. I don't know as he did.

Q. 38. He had never been up there before?

A. No, sir, never saw him before.

Q. 39. You knew he was drunk?

A. Yes, sir.

Q. 40. You knew Bill Ferguson knew him, he was a friend of his, didn't you?

A. Bill took him down stairs, I didn't know anything about their matters.

Q. 41. Didn't Bill recognize him when he came out?

A. Bill taken them down stairs.

Q. 42. What was there to keep you from going on in your apartment and letting Bill and this other man take care of Fine?

A. I didn't have nothing more to do with them

after they went down stairs until he started back up to kill me.

Q. 43. That is not my question. What was there to keep you from going on in your apartment and letting Bill and this other man take care of him, if he was drinking?

A. (Witness does not answer)

Q. 44. You just made up your mind you would stay there at the top of the steps and he would not come any farther and you got your pistol?

A. No, sir.

Q. 45. That was your home and you intended to protect it?

A. No, sir, I thought he would kill me the way he come up the stairs.

Q. 46. You went back in your room and came back to the top of the steps and met him?

A. I was standing there when he came back up.

Q. 47. I say, you went back in your room, got your pistol and came out?

A. Yes, sir, I stopped at the stairway.''

Within limits that should be cautiously set, it is not improper for a trial judge to propound to witnesses questions, impartial in tone and form, intended to clarify the evidence with respect to material facts. Here, however, we cannot escape the conclusion that the questions of the trial judge betrayed to the jury certain deductions that he had made from the testimony, and that these deductions were plainly adverse to the defendant. They were therefore questions that should not have been asked by the court. See *State* v. *Shelton*, 116 W. Va. 75, 178 S. E. 633.

*Reversed; remanded.*