**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

State of West Virginia,
Petitioner Below, Respondent

**v.)  No. 22-775** (Preston County 21-F-66)

Andrew Woods Prudnick,
Respondent Below, Petitioner

## MEMORANDUM DECISION

Petitioner Andrew Woods Prudnick appeals the Circuit Court of Preston County's September 9, 2022, order sentencing him to life imprisonment with mercy upon his conviction for first-degree murder.[1] On appeal, the petitioner raises several assignments of error, including that the circuit court erred in rejecting his proposed jury instructions, admitting a recording of a telephone call made by him during his pretrial detention, and denying his motion for a judgment of acquittal. He also argues that the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Lastly, the petitioner alleges cumulative error. Upon our review, finding no substantial question of law and no prejudicial error, we determine oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21(c).

On November 16, 2020, the petitioner shot and killed Ryan Lee Sines in a parking lot that belonged to the petitioner's rental home and was located several yards away. Law enforcement officers arrived at the home and spoke with the petitioner, who reported that he shot Mr. Sines during a verbal altercation. The petitioner stated that Mr. Sines' hand was in his pocket when he shot him and that he had discovered pistols taken from his home on Mr. Sines' person, although he did not report that Mr. Sines had brandished these weapons during the altercation. Officers also spoke to the petitioner's girlfriend, Ashley Saunders. Ms. Saunders advised the officers that she had dropped the petitioner off at work and then took Mr. Sines to the home she shared with the petitioner to retrieve some of her belongings. Ms. Saunders stated that she observed Mr. Sines going through some of the petitioner's belongings but did not see him take anything. Ms. Saunders reported that the petitioner arrived at the home and did not want Mr. Sines there. She stated that she witnessed the petitioner shoot Mr. Sines quickly and that she did not see Mr. Sines brandish a weapon. Ms. Saunders further noted that neither she nor the petitioner knew that Mr. Sines had stolen the petitioner's guns when the shooting occurred. Officers spoke with a few witnesses to the shooting, none of whom advised they saw Mr. Sines brandish a weapon.

---

[1] The petitioner appears by counsel Jeremy B. Cooper. The respondent appears by Attorney General Patrick Morrisey and Assistant Attorney General Mary Beth Niday.

1

The petitioner was indicted in June 2021 on one count of first-degree murder. At a pretrial motions hearing held on March 29, 2022, the petitioner advised the court that he would be objecting to the relevance of some of his recorded telephone calls from jail. The court did not rule on this issue until after voir dire had been conducted, ordering that the State could use a recorded call between the petitioner and his mother in its case-in-chief and noting that "[t]he State has worked on this and I'm going to permit them to use those."

The petitioner's trial commenced in May 2022. Senior Trooper Levi Hall of the West Virginia State Police testified that on the night of the incident, he responded to the scene and used a FARO, an imaging and measuring scanner, to document evidence. According to Trooper Hall's scans, Mr. Sines' body was found approximately 100.9 feet from the corner of the petitioner's home in a parking lot. Trooper Hall discussed the evidence collected, including a knife near Mr. Sines' foot, a knife from Mr. Sines' pocket, two firearms located on Mr. Sines' body, a third firearm located on the hood of the petitioner's vehicle, and seven shell casings. Trooper Hall specifically noted that no mask on or around Mr. Sines' body had been collected.

Corporal J.T. Wood of the West Virginia State Police testified that he was dispatched to the scene on the night of the shooting and spoke with the petitioner, who claimed that he had arrived home after work to discover a man dressed in all black exiting his home in a threatening manner. Cpl. Wood stated that he sought a search warrant for a security camera located on the petitioner's home and obtained footage from the time of the incident, which was played for the jury. Cpl. Wood testified that, from the video, the petitioner initially encountered Mr. Sines near the home's porch and held him at gunpoint, saying "who is it, Ryan?" To which Mr. Sines replied, "yeah, man." Cpl. Wood testified that the footage did not depict the petitioner and Mr. Sines moving to the parking lot.

Ms. Saunders testified that she and the petitioner had been in a relationship for approximately three years but that a few months prior to the shooting, their relationship had declined, and the pair moved into separate rooms and became roommates. Around October 2020, Ms. Saunders stated that Mr. Sines reached out to her and the two began seeing each other nearly daily. Ms. Saunders stated that the petitioner had met Mr. Sines when he visited Ms. Saunders on various occasions at their home. She noted that both she and the petitioner knew that Mr. Sines abused methamphetamine and had a criminal history including theft.

Ms. Saunders testified that on the night of the shooting, she dropped the petitioner off at work around 6:30 p.m. and stated that she expected him to remain at work until his shift ended at 6:30 a.m. After dropping the petitioner off, Ms. Saunders picked up Mr. Sines, and the two drove back to the home Ms. Saunders shared with the petitioner. When the petitioner arrived at the home a little while later with his friend Thomas Dunbar, Ms. Saunders assumed that the petitioner had seen Mr. Sines on their security camera. She stated that she felt panicked because the petitioner did not like her spending time with Mr. Sines. Ms. Saunders stated that the petitioner came towards the house with a gun raised, yelling "[w]ho the f**k are you? Is that Ryan?" Ms. Saunders testified that Mr. Sines said yes and told the petitioner to calm down. According to Ms. Saunders, she and Mr. Sines headed towards the car, and the petitioner kept his gun raised at Mr. Sines the entire time. Mr. Sines and the petitioner then walked ahead of Ms. Saunders into the parking lot, where she watched the petitioner curse and then shoot Mr. Sines multiple times, pausing briefly before

the last shot. Ms. Saunders stated that the petitioner was the aggressor in the situation and that Mr. Sines was trying to get away from him and did not brandish any weapons to her knowledge, though her view was partially obstructed by a vehicle. Ms. Saunders described the petitioner's demeanor after the shooting as calm and emotionless. She acknowledged that the petitioner called 9-1-1, disassembled the gun and placed it on top of a vehicle, and cooperated with law enforcement officers.

Mikaela Wagner testified that she was visiting her mother in November 2020 when she watched two people exit a neighbor's home and walk towards a parking lot. She stated that a vehicle pulled into the parking lot and a man exited the vehicle and spoke aggressively towards the pair in the yard, yelling "who are you?" and "yeah, you're Ryan." Ms. Wagner heard another voice reply, "I'm Ryan . . . will you please put away the gun" and then a third, female voice stated, "yeah, please put away the gun." Moments later, Ms. Wagner heard a male voice say, "if you're going to shoot me, shoot" followed by several gunshots.

Mr. Dunbar testified that the petitioner texted him on the evening of November 16, 2020, and requested that Mr. Dunbar pick him up from work. Mr. Dunbar stated that when he picked the petitioner up from work, the petitioner resigned from his job and the two headed towards the petitioner's house. Mr. Dunbar described the petitioner as "eerily quiet" on the drive.

Upon arriving at the petitioner's home, Mr. Dunbar parked by the petitioner's vehicle, which Ms. Saunders had driven earlier in the evening, and noticed that it was idling. Mr. Dunbar stated that the petitioner sat quietly for approximately one minute before exiting the vehicle and retrieving a gun from the glovebox of his own vehicle. The petitioner returned to Mr. Dunbar's car and loaded the weapon. Around the same time, Mr. Dunbar saw Ms. Saunders and a man, who he later learned was Mr. Sines, dressed in all black clothing, exiting the home. The petitioner told Mr. Dunbar to stay and then started walking towards Ms. Saunders and Mr. Sines. Mr. Dunbar explained that, at that point, he felt like he needed to leave as things were "getting serious" and began looking down at his cellphone to text his wife. Mr. Dunbar testified that he heard the petitioner ask for the identity of the man with Ms. Saunders and that Mr. Sines taunted the petitioner by saying things like "why don't you put the gun down and fight me like a man." According to Mr. Dunbar, Mr. Sines' speech and erratic behavior led him to believe Mr. Sines was under the influence. Mr. Dunbar stated that the petitioner and Mr. Sines moved behind his car when he heard gravel crunching and the petitioner yell "what the f**k" before several gunshots. Mr. Dunbar testified that he felt like Mr. Sines was approaching the petitioner but did not know, as he was looking down at his cellphone at the time. After the shooting, Mr. Dunbar described the petitioner as upset and stated that the petitioner attempted life-saving measures on Mr. Sines. Mr. Dunbar opined that, from his perspective, Mr. Sines had been the aggressor. However, on redirect, Mr. Dunbar admitted that the petitioner had told Mr. Sines that he was "going to scatter his brains all over the yard."

The State also called John Frisby, an investigator with the West Virginia Division of Corrections and Rehabilitation. According to Mr. Frisby, he provided the prosecution with several of the petitioner's communications while incarcerated, including a recorded telephone conversation between the petitioner and his mother, which was played for the jury. Others who

testified on behalf of the State included retired and active deputies from the Preston County Sheriff's Office, a neighbor, a firearm and toolmark examiner, and a medical examiner.

The defense presented only two witnesses: a forensic toxicologist, who testified that Mr. Sines had high levels of methamphetamine in his system at the time of death, and the petitioner's optometrist.

Following the presentation of evidence, the petitioner moved for a judgment of acquittal, which the court denied. The petitioner also requested several jury instructions pertaining to self-defense, which the court denied, stating "I think that they're in there maybe not in the exact words you wanted, but I think they're in there about that." The court also denied the petitioner's requested instruction on imperfect self-defense, finding that West Virginia has not adopted the doctrine, and denied a requested instruction on the castle doctrine, finding that Mr. Sines was a guest in the house and that the petitioner did not know Mr. Sines had stolen anything from him at the time of the shooting. Likewise, the court declined to instruct the jury on the petitioner's duty to retreat, or lack thereof.

During deliberations, the jury sent a note informing the court that while inspecting Mr. Sines' pants worn the night of the shooting, a baggie with a substance inside fell from the pocket. The court, the prosecutor, and the petitioner's counsel removed the baggie from the jury's room, and the court instructed the jury to disregard the baggie. Following deliberations, the jury rendered a verdict of guilty of first-degree murder with a recommendation of mercy.

The petitioner subsequently filed a motion for a new trial and a motion for judgment of acquittal. At a sentencing hearing held on September 7, 2022, the circuit court denied each of the petitioner's post-trial motions and sentenced him to imprisonment for life and recommended that he not be granted parole until he had served forty years. The petitioner appeals the court's sentencing order entered on September 9, 2022.

In his first assignment of error, the petitioner argues that the circuit court erred in rejecting his proposed jury instructions regarding self-defense, the castle doctrine, the lack of duty to retreat, and imperfect self-defense. According to the petitioner, the court's rejection of these instructions was prejudicial. Specifically, the petitioner argues that the court erred in refusing to give his instructions on self-defense and imperfect self-defense because they were necessary to instruct the jury on the petitioner's subjective impression regarding Mr. Sines and the threat he posed. The petitioner claims that the instructions as given by the court did not allow for the jury to consider his subjective impression and that had the court given the petitioner's instructions, the jury could have considered a reduction of the petitioner's criminal responsibility and convicted him of a lesser-included offense. The petitioner claims that the court likewise erred in refusing to give his proffered instructions on the castle doctrine and his lack of duty to retreat. He argues that under the facts established at trial, he was under no duty to retreat from Mr. Sines and, arguably, was entitled to use deadly force against him. In sum, the petitioner contends that the court's generalized jury instruction on self-defense inadequately informed the jury of the applicable law and entitles the petitioner to a new trial.

4

Our review of issues arising from jury instructions is two-part. "As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo*." Syl. Pt. 1, *State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d 257 (1996). "Whether facts are sufficient to justify the delivery of a particular instruction is reviewed by this Court under an abuse of discretion standard. In criminal cases where a conviction results, the evidence and any reasonable inferences are considered in the light most favorable to the prosecution." Syl. Pt. 12, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994). Moreover, a trial court's refusal to give a requested jury instruction is reversible error only if the instruction is a correct statement of law, is not substantially covered by the other instructions given, and it concerns an issue so important that the failure to give the instruction seriously impairs the defendant's ability to give an effective defense. *Id.* at 168, 451 S.E.2d at 734, Syl. Pt. 11.

We first address the petitioner's contention that the jury instructions given by the court did not adequately instruct the jury as to the petitioner's perception of the events and his "apparent necessity" to employ self-defense. This Court has previously noted that "[a] long-standing tenet of our self-defense doctrine is that a defendant's use of deadly force must be based upon a reasonable apprehension by the defendant that he or she was at imminent peril of death or serious bodily injury." *State v. Harden*, 223 W. Va. 796, 801, 679 S.E.2d 628, 633 (2009). Our consideration of the "reasonableness" of a defendant's belief that he was in imminent danger of death or serious bodily injury is two-fold, with a subjective and an objective component. *Id.* at 802-03, 679 S.E.2d at 634-35. More specifically, a defendant must "actually believe that [he] is in danger and that belief must be a reasonable one." *State v. Cook*, 204 W. Va. 591, 601, 515 S.E.2d 127, 137 (1999) (citing *State v. Elam*, 328 N.W.2d 314, 317 (Iowa 1982)).

Upon our review of the jury instructions given by the court, we conclude that the jury was adequately instructed as to the law regarding the petitioner's subjective impression in his self-defense claim. The instructions given by the court stated that a person could claim self-defense if he "was not the aggressor, and had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily injury from which he could save himself only by using deadly force . . . ." The court further instructed that "[t]he circumstances under which [the petitioner] acted must have been such as to produce in the mind of a reasonable prudent person, similarly situated, the reasonable belief that the other person was then about to kill . . . or do to [the petitioner] serious bodily harm" and that the petitioner "must have actually believed that he was in imminent danger of death or seriously bodily harm and that deadly force had to be used to repel it." This instruction clearly and sufficiently informed the jury as to the correct legal principles of self-defense in this State. As we have previously held, "[i]t is not error to refuse to give an instruction to the jury, though it states a correct and applicable principle of law, if the principle stated in the instruction refused is adequately covered by another instruction or other instructions given." Syl. Pt. 8, in part, *State v. Hoard*, 248 W. Va. 428, 889 S.E.2d 1 (2023) (quoting Syl. Pt. 3, *Morgan v. Price*, 151 W. Va. 158, 150 S.E.2d 897 (1966)). Based on the foregoing, we conclude that the instructions given by the court adequately covered the content of the petitioner's proffered instructions, and the court did not err in refusing to give the petitioner's instructions.

Next, we find no error in the court's decision to reject the petitioner's proposed jury instructions on imperfect self-defense as this Court has never adopted the doctrine. *See State v.*

*Shute*, No. 18-0969, 2020 WL 878584, at *4 (W. Va. Feb. 24, 2020) (memorandum decision) ("[A]s this Court has never adopted this doctrine, we hold that the circuit court did not err in denying petitioner's proposed imperfect self-defense instruction."); *State v. York*, No. 13-1265, 2015 WL 1881028, at *3 (W. Va. Apr. 23, 2015) (memorandum decision) ("This Court has not recognized or adopted the doctrine of 'imperfect self-defense.'"). Accordingly, the petitioner's proposed jury instruction on imperfect self-defense was not a correct statement of the law in West Virginia, and, therefore, the petitioner is entitled to no relief in this regard.

Lastly, we find no error in the circuit court's decision to reject the petitioner's jury instruction on the castle doctrine or the lack of duty to retreat. The castle doctrine is encapsulated in Syllabus Points 1 and 2 of *State v. W.J.B.*, 166 W. Va. 602, 276 S.E.2d 550 (1981), which hold:

> 1. "A man attacked in his own home by an intruder may invoke the law of self-defense without retreating." Syllabus Point 4, *State v. Preece*, 116 W.Va. 176, 179 S.E. 524 (1935).

> 2. The occupant of a dwelling is not limited in using deadly force against an unlawful intruder to the situation where the occupant is threatened with serious bodily injury or death, but he may use deadly force if the unlawful intruder threatens imminent physical violence or the commission of a felony and the occupant reasonably believes deadly force is necessary.

We have further explained that "[u]nder the castle doctrine, to justify deadly force resulting in death, the occupant must show that the assailant was an intruder, that the intruder threatened imminent physical violence or the commission of a felony, and that the occupant reasonably believed deadly force was necessary." *State ex rel. Adkins v. Dingus*, 232 W. Va. 677, 682, 753 S.E.2d 634, 639 (2013).

Here, the facts adduced at trial do not support the giving of an instruction on the castle doctrine. At the outset, we note the petitioner's argument that the parking lot situated approximately 100 feet from his home was encompassed within the "curtilage" of his home, allowing him to raise this defense. However, the petitioner cites to no authority in which this Court has upheld such a broad application of the castle doctrine. *Cf. State v. Parsons*, No. 19-0141, 2020 WL 3408414, at *2-*3 (W. Va. June 18, 2020) (memorandum decision) (finding that application of the castle-doctrine instruction would be "unsustainably broad" where the evidence demonstrated that the defendant left his residence and crossed a large yard, stepping into a public roadway to access the victim).

Moreover, the evidence does not demonstrate that Mr. Sines was an intruder in the petitioner's home, that Mr. Sines threatened imminent physical violence or the commission of a felony, or that the petitioner reasonably believed that deadly force was necessary. Rather, the evidence demonstrated that Mr. Sines had been invited into the home by a lawful occupant, Ms. Saunders, and that it was the petitioner who approached Mr. Sines in an aggressive

manner as Ms. Saunders and Mr. Sines were attempting to leave the premises.[2] The record is devoid of any evidence demonstrating that Mr. Sines had threatened imminent physical violence or the commission of a felony. Indeed, Ms. Saunders testified that when the petitioner shot Mr. Sines, that the petitioner was not aware that Mr. Sines had taken firearms from the home. Moreover, little evidence was presented demonstrating that the petitioner reasonably believed that deadly force was necessary. While Mr. Dunbar testified that he believed that Mr. Sines was the aggressor, he admitted that he did not see the shooting because he was looking at his cellphone and acknowledged that the petitioner threatened Mr. Sines. Further, both Ms. Saunders and Ms. Wagner testified that it was the petitioner who angrily approached Mr. Sines. Under the particular circumstances of this case, we cannot find that the circuit court erred in determining that an instruction on the castle doctrine was not applicable. *See* Syl. Pt. 4, in part, *State v. Collins*, 154 W. Va. 771, 180 S.E.2d 54 (1971) (holding that "an instruction which is not supported by evidence should not be given."). In sum, we conclude that the circuit court did not err in rejecting the petitioner's proffered instructions on self-defense, imperfect self-defense, and the castle doctrine.

The petitioner also assigns as error the circuit court's admission of a recorded telephone call from his pretrial incarceration. The petitioner argues that the call was irrelevant to establishing any element of first-degree murder and was extremely prejudicial because it drew attention to the petitioner's pretrial detention and Mr. Sines' surviving family members. He further claims that the circuit court's basis for admitting the telephone call was inapplicable and failed to address his objection to its relevance.

We conclude that the petitioner has failed to demonstrate error. Subsequent to filing his brief and appendix, the petitioner's counsel attempted to file a flash drive containing the audio files of the recorded telephone call but cautioned that he had been unable to listen to the files on his own computer. We, likewise, have been unable to listen to the audio recording of this telephone call. As such, we are left with neither a transcript of the complained-of telephone call, nor a recording of the call, and, consequently, the petitioner's entire argument within his brief is based upon a summarization of the call's contents made by the State during its closing argument.

This summary of the call is simply inadequate to demonstrate that the petitioner was prejudiced by the recording's admission. We have long held that litigants are required to present a record upon which this Court may thoroughly consider the alleged errors raised on appeal. *See Morgan*, 151 W. Va. at 158-59, 150 S.E.2d at 899, Syl. Pt. 5 ("An appellant must carry the burden of showing error in the judgment of which he complains. This Court will not reverse the judgment of a trial court unless error affirmatively appears from the record. Error will not be presumed, all presumptions being in favor of the correctness of the judgment."). We have further stated that we "will ignore those issues where the missing record is needed to give factual support to the claim." *State v. Honaker*, 193 W. Va. 51, 56 n.4, 454 S.E.2d 96, 101 n.4 (1994); *accord* Franklin D.

---

[2] We acknowledge the petitioner's argument that a co-occupant can invoke self-defense against another co-occupant. *See Harden*, 223 W. Va. at 798, 679 S.E.2d at 630, Syl. Pt. 3. We do not find the facts of *Harden* to be applicable to this case. However, even assuming for the sake of argument that Mr. Sines could have been considered either a co-occupant or an intruder for the purposes of the petitioner's castle-doctrine claim, we note that the petitioner has failed to establish the other factors for consideration of the castle doctrine, as noted more fully above.

7

Cleckley, *Handbook on West Virginia Criminal Procedure*, Vol. II, p. 497-98 (2nd Ed. 1993) ("Not only must the significant portion of the record relating to th[e] alleged error be identified, the precise part of the record must be designated. Otherwise, the error will be treated as non[-]existing.") (citations omitted). This Court will not presume error, and, accordingly, we cannot find that the circuit court erred in admitting the recorded jail call.[3]

In a third assignment of error, the petitioner argues that the State failed to present sufficient evidence of his guilt and that, as such, the court erred in denying his motion for a judgment of acquittal. According to the petitioner, the facts established at trial demonstrated that Mr. Sines was a masked, knife-wielding, drug-using burglar who approached the petitioner on the curtilage of his home in an irrational and erratic manner. The petitioner contends that under the circumstances, he was justified in using deadly force and that his actions do not constitute first-degree murder.

"The Court applies a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence. *State v. LaRock*, 196 W.Va. 294, 304, 470 S.E.2d 613, 623 (1996)." *State v. Juntilla*, 227 W. Va. 492, 497, 711 S.E.2d 562, 567 (2011). Challenging the sufficiency of the evidence to support a conviction is a heavy burden. Syl. Pt. 9, in part, *State v. Stone*, 229 W. Va. 271, 728 S.E.2d 155 (2012) (quoting Syl. Pt. 3, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995)). This Court reviews "all the evidence . . . in the light most favorable to the prosecution" and credits "all inferences and credibility assessments that the jury might have drawn in favor of the prosecution." *Stone*, 229 W. Va. at 274, 728 S.E.2d at 158, Syl. Pt. 9, in part. We will only set aside a verdict "when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id.* In sum, "the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." *Juntilla*, 227 W. Va. at 494, 711 S.E.2d at 564, Syl. Pt. 1, in part.

Here, the evidence, when viewed in the light most favorable to the prosecution and crediting it with all inferences that the jury might have drawn, showed that the petitioner abruptly quit his job, obtained a ride home, retrieved a firearm from his vehicle, loaded it, crossed a large yard, verbally identified Mr. Sines, and then followed Mr. Sines back into the parking lot while holding Mr. Sines at gunpoint before shooting him six times, pausing before the last shot. Further, Ms. Saunders' testimony established that the petitioner was unhappy that she was seeing Mr. Sines and likely left his job after viewing the two of them together on his security camera, and Mr. Dunbar testified that the petitioner was "eerily quiet" on the way home and that he threatened to scatter Mr. Sines' brains over the yard. Finally, Ms. Wagner described a man, whom the evidence demonstrates was the petitioner, as the aggressor in the situation. Accordingly, it cannot be said

---

[3] Even if we were to accept the petitioner's representation of the telephone call as true, we fail to see how admission of the telephone call could be anything more than harmless error. The State's evidence of the petitioner's guilt, as set forth more fully below, was overwhelming. *See State v. Salmons*, 203 W. Va. 561, 582, 509 S.E.2d 842, 863 (1998) ("[O]ur cases consistently have held that nonconstitutional errors are harmless unless the reviewing court has grave doubt as to whether the [error] substantially swayed the verdict.") (quoting *State v. Potter*, 197 W. Va. 734, 748, 478 S.E.2d 742, 756 (1996)).

that the record contains no evidence from which the jury could have found that petitioner willfully, deliberately, and premeditatedly killed the victim. *See* W. Va. Code § 61-2-1 ("Murder . . . by any willful, deliberate and premediated killing . . . is murder of the first degree."). While the petitioner claims that he demonstrated that his actions were in self-defense, "[i]t is peculiarly within the province of the jury to weigh the evidence upon the question of self-defense, and the verdict of a jury adverse to that defense will not be set aside unless it is manifestly against the weight of the evidence." *See* Syl. Pt. 7, *State v. White*, 231 W. Va. 270, 744 S.E.2d 668 (2013) (citations omitted). Given the foregoing, we conclude that the State's evidence was sufficient to sustain petitioner's conviction for first-degree murder.

In his fourth assignment of error, the petitioner argues that the baggie that fell out of Mr. Sines' pants during deliberations likely contained drugs and constituted material subject to disclosure under *Brady*, which requires the State to disclose evidence that is "favorable to an accused." 373 U.S. at 87. According to the petitioner, the drugs were both exculpatory and material to the petitioner's case, as they tended to support the petitioner's contention that Mr. Sines was a dangerous, erratic drug user. The petitioner contends that officers knew, or should have known, of the presence of the baggie in Mr. Sines' pants and that their knowledge was imputed to the prosecutor and that the failure to disclose the evidence warrants a new trial. The petitioner acknowledges that he did not request relief on this issue below and, as such, requests that we review for plain error.

"To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). "To be 'plain,' the error must be 'clear' or 'obvious[.]'" *Id.* at 7, 459 S.E.2d at 118, Syl. Pt. 8, in part. "To affect substantial rights means the error was prejudicial. It must have affected the outcome of the proceedings in the circuit court, and the defendant rather than the prosecutor bears the burden of persuasion with respect to prejudice." *Id.* at 7, 459 S.E.2d at 118, Syl. Pt. 9, in part.

At the outset we note that the petitioner did not undertake a plain error analysis in his brief. Nevertheless, we conclude that the petitioner has failed to demonstrate that his due process rights were violated under *Brady* or this State's counterpart to *Brady*, *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982). To establish a *Brady* violation, a defendant must show that the evidence at issue was "favorable to the defendant as exculpatory or impeachment evidence," that it was "suppressed by the State," and that it was "material." Syl. Pt. 2, in part, *State v. Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 (2007). All three components must be satisfied, and we need not address all the components if one is not met. *State v. A.B.*, 247 W. Va. 495, 508, 881 S.E.2d 406, 419 (2022) (citation omitted).

Here, we conclude that the petitioner has failed to demonstrate that the baggie was material evidence. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *Youngblood*, 221 W. Va. at 32, 650 S.E.2d at 131). And "the withheld evidence 'must be evaluated in the context of the entire record.'" *Id.* (quoting *United States v. Agurs*, 427 U.S. 97 (1976)). The State presented extensive evidence during the trial as to the petitioner's willful, deliberate, and

premeditated actions in shooting and killing Mr. Sines, as set forth more fully above. Examining the baggie within the totality of the evidence, we cannot find that the petitioner's trial would have been different had the baggie been disclosed. Specifically, the petitioner claims that the baggie would have been favorable evidence to demonstrate that Mr. Sines was a drug user and acted erratically. However, evidence of Mr. Sines' drug usage and behavior was adduced through the toxicologist's testimony that Mr. Sines had high levels of methamphetamine in his system at the time of death, Ms. Saunders' testimony that Mr. Sines had a history methamphetamine abuse, and Mr. Dunbar's testimony that Mr. Sines acted erratically and appeared under the influence on the night he was shot and killed. Given the other evidence of Mr. Sines' drug use and the overwhelming evidence supporting the petitioner's guilt, the baggie's disclosure would have been unlikely to have resulted in a different verdict. *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (holding that reversal is not required where undisclosed evidence was possibly useful to the defense but not likely to have changed the verdict). Accordingly, because the petitioner has failed to establish the materiality component of *Brady*, we cannot find plain error.

In his final assignment of error, the petitioner contends that the cumulative effect of the above-mentioned errors deprived him of a fair trial. But the "[c]umulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." *State v. Knuckles*, 196 W. Va. 416, 426, 473 S.E.2d 131, 141 (1996). Having failed to establish any error, the petitioner has not established cumulative error.

For the reasons stated above, this Court affirms the September 9, 2022, final order of the Circuit Court of Preston County.

Affirmed.

**ISSUED:** September 24, 2024

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice John A. Hutchison
Justice William R. Wooton
Justice C. Haley Bunn